**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas NESBITT,
Defendant–Appellant.**

No. 86–3150.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1987.

Decided July 26, 1988.

Rehearing and Rehearing In Banc
Denied Sept. 9, 1988.

Richard A. Hanning, Hammond, Ind., for defendant-appellant.

Richard A. Cook, Asst. U.S. Atty., James G. Richmond, U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before COFFEY, RIPPLE, and MANION, Circuit Judges.

COFFEY, Circuit Judge.

The defendant-appellant Thomas Nesbitt appeals his convictions and sentences on charges of conspiracy to manufacture methamphetamine, a controlled substance, and the manufacture of phenyl–2–propanone ("P2P") in violation of 21 U.S.C. § 846, 841(a)(1). We affirm.

## I. *Factual Background*

The United States Drug Enforcement Administration ("DEA") operated an undercover business in Elk Grove Village, Illinois, known as North Central Industrial Chemicals, Inc. ("NCIC"). NCIC offered a variety of chemicals and lab equipment for sale. Its customers were discretely screened in an attempt to determine whether or not the chemicals or equipment purchased were being used for illegal purposes, including the manufacture of controlled substances. As part of the screening process, a DEA chemist would review a copy of each of the customers' receipts in an attempt to ascertain the potential use of the chemical or a combination of them the customer had purchased.[1] If the chemist determined, on the basis of the type and/or amount of chemicals purchased, that there was a distinct possibility the chemicals could be combined to produce an illegal drug, the DEA would undertake a more thorough investigation.

On October 17, 1984, James Nesbitt, the defendant's brother, and Ana DaSilva, later identified as the defendant's girlfriend, visited NCIC and placed an order for equipment and chemicals. Among the items ordered was phenylacetic acid, a chemical used to synthesize P2P, a necessary component in the preparation of methamphetamine (a non-narcotic controlled substance).[2] Based upon the potential that phenylacetic acid, in combination with the type and amount of chemicals James and Ana purchased, could very well be used to manufacture methamphetamine, the DEA decided to place James and Ana under surveillance when they returned to NCIC to pick up their order.

Later that day James and Ana picked up their merchandise, and the DEA dispatched a number of cars (a DEA agent testified that "probably more" than six cars were involved) to tail the couple after their departure from NCIC. Despite the six-vehicle surveillance team, James and Ana lost the agents in heavy traffic near Chicago.

In the ensuing days, James Nesbitt placed several telephone calls to NCIC to order more chemicals and lab equipment, and on October 23, 1984, returned to NCIC to pick up the materials previously ordered.[3] The DEA again instituted surveil-

1. The DEA's screening process included an identification check on the individuals who sought to purchase chemicals and lab equipment from NCIC. A DEA agent also testified that NCIC's prices were "considerably higher than the prices charged for comparable chemicals from other non-affiliated [non–DEA] companies in the Chicago area."

2. See the testimony of DEA chemist Terry Dal Cason, *infra* note 3.

3. Among the materials purchased on October 17 and 25, 1984, were the following: sodium acetate, phenylacetic acid, sulfuric acid, hydrochloric acid, a graduated cylinder, ring stands, beakers, a corning hot plate and stirrer, a vacuum pump, a mercury manometer, an Erlen-meyer flask, a two-liter filter flask, a breaker e-p funnel, thermometers, glass funnel, glass adapter, glass tubing, bunson burner, valves, clamps, stoppers, cork board, Formamide, chloroform, alcohol reagent, and acidic anhydride, all used in the preparation of methamphetamine. At trial, a DEA chemist, Terry Dal Cason, explained their use in the preparation of metamphetamine:

"Q. If you were going to give somebody a basic recipe for making P2P what would that recipe be and if you could go to the chalk-board and write down the recipe.
A. Yes, sir. Using the process I discussed yesterday what would be required is—
Q. If you could do it like in cups of chemicals. That is something everybody understands as far as a unit?

lance, following him (James Nesbitt) from NCIC to a chemical company in downtown Chicago. The agents tailed him to the University of Illinois Circle Campus, in Chicago, Illinois, then south on the Dan Ryan to Audio Tech, Inc. and ultimately to his residence in Crete, Illinois, a southern suburb of Chicago. The DEA continued their surveillance of James' residence until the late evening of October 23; the next morning they resumed their stakeout, and followed his car to the downtown Chicago chemical company. After James departed from there, he once more lost the agents in heavy traffic.

After James Nesbitt had returned to his home in Crete, Illinois, during the later evening hours of October 24, special agents of the DEA conducted a search of the premises pursuant to a court-authorized warrant (unchallenged on appeal) and found no trace of chemicals, lab equipment or illegal drugs. James was not arrested at this time. Following the search of his Crete residence (concluded during the early morning hours of October 25), James took DEA agents (apparently voluntarily) to the outside of a secluded rural residence in New Carlisle, Indiana, owned by one Douglas Massey.[4] The agents did not search or attempt to enter the premises that evening.

The next day a second search warrant authorizing a search of the New Carlisle, Indiana, premises was procured, and on the evening of October 26, DEA agents executed a search of the residence. The defendant, Thomas Nesbitt, who identified himself to agents as Michael Stein (his alias used since 1979), and Ana DaSilva were both present during the search. A search of the attic uncovered a variety of chemicals, lab equipment, and chemistry texts; further, a xerox copy of a chemical formula for the preparation of amphetamine and methamphetamine was recovered from the bedroom. During the search of a kitchen cabinet a one-pint, brown glass bottle containing P2P (a precursor to methamphetamine and a controlled substance) was found. Later testing for fingerprints revealed the presence of the defendant's prints on the bottle. Several documents bearing the name Michael Stein were also confiscated from the house during the search, including one bearing the defendant's picture and the signature "Michael Stein." A Brazilian work permit, as well as payroll stubs from a Brazilian company, listing the employee as Michael Stein, was also found in the house. Massey, the owner of the residential property, testified at trial that sometime after he rented the apartment to Michael Stein, a stove had been moved up to the kitchen from the basement and a ventilating hood for the dispersal of fumes installed over the two stoves now in the kitchen.

During Thomas's trial, Terry Dal Cason, a DEA chemist, testified about the significance of the various chemicals, lab equipment, and other items found during the

---

A. Take six cups or parts of acedic anhydride which is one component.... We can just label it item 1. Item 2, one cup of phynelacetic acid which chemists usually call PAA. And Item 3 would be one-half cup of sodium acetate and I will just use NAA to represent sodium acetate. And then boil 18 to 20 hours.
Q. At what temperature?
A. At the boiling temperature. You don't have to be concerned about [what] temperature it is because when you heat it up it will only get up to the boiling point and no hotter. Once it starts boiling you are at the correct temperature.

. . . . .

Q. Then after you get the P2P what do you [do] with the P2P in the recipe to come up with methamphetamine?
A. Again using this type of a setup this results in the manufacture of P2P. We can call

item A. You take one part of P2P or one cup. Item B will be Formamide, one cup Formamide. And again you boil. And the total boiling time over a temperature range for this is possibly about eight hours roughly. And at the end of that time then you have an intermediate I mentioned yesterday, N–Formyl amphetamine, which will give you amphetamine or methamphetamine according to what route you choose to apply to the intermediate."

4. At trial, Massey testified that since August of 1984, he had rented the house to a man who went by the name of Michael Stein. Massey claimed that he was unable to identify the defendant (Thomas Nesbitt) as the man who had rented the residence.

search of the New Carlisle residence.[5] Based upon his observation of the search scene and the various chemicals, lab equipment, and other items located therein, Dal Cason recited that in his opinion the New Carlisle residence was used as a clandestine lab for the production of illegal chemicals.[6] Dal Cason also testified that considering the amount of chemicals found at the New Carlisle lab, the defendant had the potential to produce up to a total of approximately 115,000 individual dosages of methamphetamine.

## II. *Procedural Background*

At the conclusion of their search of the New Carlisle, Indiana, residence on October 26, 1984, the DEA arrested Thomas Nesbitt and filed a one-count complaint charging "Michael Stein" with conspiracy to manufacture methamphetamine. Three days later, on October 29, 1984, the defendant made his initial appearance before a judicial officer, received an explanation of the charges against him, and identified himself to the court as Thomas Nesbitt. Thereafter, the government learned that Nesbitt was wanted in Nebraska on an outstanding warrant for the crime of murder. Consequently, the government moved to dismiss the federal drug charges against the defendant without prejudice, thus allowing the defendant to be tried in Nebraska on the more serious pending state murder charge, prior to his federal drug charge trial. At a hearing on the government's motion to dismiss the federal charges without prejudice, held November 20, 1984, counsel for the defendant expressed her opinion that the government's sole purpose for dismissing the complaint was to halt the running of the Speedy Trial Act clock, allowing the government to refile a complaint or seek an indictment at a later date. The magistrate conducting the hearing stated that if her statements constituted an objection to the government's motion, the objection was overruled. The magistrate granted the government's motion to dismiss the federal charge without prejudice, and the defendant was surrendered to the custody of Indiana state authorities pursuant to Indiana's Fugitive from Justice Act to allow him to answer to the Nebraska authorities on the pending murder charge.

From November 20, 1984, through January 11, 1985, the defendant was held in the custody of Indiana state officials pending hearings on the defendant's challenge to extradition proceedings relating to the Nebraska murder charge. Extradition was granted, and the defendant was conveyed to the custody of Nebraska officials and subsequently convicted on the murder charge. On April 17, 1986, the state of Nebraska sentenced him to a term of life imprisonment.

---

5. Dal Cason, who was present during the search of the New Carlisle residence, testified that during his career as a DEA chemist, he had participated in the search of approximately 100 clandestine home laboratories used to manufacture illegal drugs. He stated that in his experience, the types of drugs, equipment, and other items located at the residence, were consistent with those used and usually ·found in a lab that produces amphetamine or methamphetamine. Dal Cason further testified that the location of the New Carlisle residence itself was well-suited for a secret lab. As Dal Cason explained:

"Q. What other sorts of characteristics would you want the lab to have?
A. Well, you would want to make it difficult for somebody to observe what was happening at the residence. Agents frequently try to obtain warrants by detecting odors and if you are in a rural area where people aren't normally walking along sidewalks walking close to a residence if somebody were to do that on a frequent basis it would be obvious that they are there for surveillance and so having a rural setting also has that possible aspect that it is difficult to conduct a surveillance on a residence in a rural area.
Q. And you were out at the residence there in New Carlisle, Indiana, and had a chance to observe the surrounding area?
A. Yes, sir.
Q. How would you size up the quality of the location for a clandestine lab?
A. It was in a fairly good location for a clandestine lab. The neighbors were spaced a distance apart. It would probably be described more as semi-rural rather than rural. But still a good location."

Dal Cason further testified that in his opinion the New Carlisle lab had only been in operation for a short period of time and was still in the "experimental" stage.

6. Dal Cason further opined that the lab probably had been dismantled following the production of P2P, the precursor to methamphetamine and itself a controlled substance.

Meanwhile, on November 28, 1984, while he was still in the custody of Indiana officials, a Hammond, Indiana, grand jury returned a five-count indictment against the defendant, charging him with violations of 21 U.S.C. § 841(a)(1), 846 and 18 U.S.C. § 1952 (relating to his alleged manufacture of illegal drugs). Subsequently, on December 20, 1984, the government filed an *ex parte* motion with the federal district court to exclude time under the Speedy Trial Act due to the pendency of the Nebraska state proceedings. The court granted the motion the following day, ordering all the time from the date of the government's motion until the conclusion of the Nebraska proceedings excluded "in the interest of justice" under 18 U.S.C. § 3161(h)(8).

On April 18, 1986, following the defendant's conviction and sentence in Nebraska, the defendant, through his custodial officer, demanded trial on the federal charges. The court issued a Writ of Habeas Corpus *ad Prosequendum* and set the defendant's initial appearance for May 29, 1986. However, because of problems coordinating his release with Nebraska officials, the United States Marshal notified the government that it would be unable to transport the defendant as originally ordered, and on May 22, 1986, the government petitioned for the issuance of another writ. The court granted the petition, ordering that the defendant be delivered to federal court on June 13, 1986, for his appearance and arraignment on the drug charges. Thomas Nesbitt appeared for his initial appearance on June 13, represented by court-appointed counsel. Subsequently, the district court granted the defendant's *pro se* motion for the appointment of new counsel, but the newly-appointed counsel withdrew on July 2, 1986. Then on July 25, 1986, the defendant moved for leave to proceed *pro se* and the court in granting the motion on August 29, 1986, also ordered the appointment of Richard A. Hanning to act as standby counsel. On September 30, 1986, the court initiated hearings on all motions then pending. This hearing was resumed on October 27 upon the defendant's motion. On November 12, 1986, the court entered its written opinion on the issues presented.

On November 17, 1986, Thomas went to trial before a jury on two counts of conspiracy to manufacture methamphetamine and the manufacture of P2P. The jury returned verdicts of guilty on both counts, and Thomas was sentenced to concurrent terms of five years' imprisonment on each count to run consecutive to his Nebraska murder sentence.

Nesbitt challenges his convictions and sentences on five separate grounds: (1) that the evidence was insufficient to connect Thomas Nesbitt to the manufacture of P2P or the conspiracy to manufacture methamphetamines; (2) that he was denied his right to compulsory process through the deportation of a material witness; (3) the inadvertent destruction of evidence violated his right to due process; (4) that the prosecution failed to comply with the Speedy Trial Act and the Interstate Agreement on Detainers; and (5) the disparity between his sentences and those of his co-defendants requires reversal of his sentences. As we discuss *infra*, Nesbitt's challenge to the Speedy Trial Act and the Interstate Agreement on Detainers fails, thereby necessitating a discussion of the remaining issues. We proceed initially to an examination of the defendant's challenge to the sufficiency of the evidence.

### III. *Sufficiency of the Evidence*

Nesbitt insists that the government's evidence (summarized in the factual section of this opinion) is "wholly insufficient" to sustain his convictions for conspiracy to manufacture methamphetamine and the substantive charge of manufacturing P2P. The elements of those crimes are found in Title 21 U.S.C. § 841(a)(1), which makes it a crime for any person knowingly or intentionally "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance," and Title 21 U.S.C. § 846, which provides:

"Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment pre-

scribed for the offense, the commission of which was the object of the attempt or conspiracy."

"Under a combination §§ 841(a)(1), 846 prosecution, the government must prove that defendant [Thomas Nesbitt] knew of the conspiracy to [manufacture] drugs and that he intended to join and associate himself with its criminal design and purpose." *United States v. Griffin*, 827 F.2d 1108, 1117 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988).

In evaluating the defendant's sufficiency of the evidence challenge, we note that he bears a heavy burden. Initially, we "review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government." *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984). *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "The test is whether, after viewing the evidence in the light most favorable to the government, *'any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pritchard*, 745 F.2d at 1122 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). Specifically, in a conspiracy/drug case this court has stated that:

> "This court has, on numerous occasions, had the opportunity to review convictions for violation of 21 U.S.C. §§ 841(a)(1), 846. As we have previously stated, and again reiterate, when reviewing the sufficiency of evidence to establish a conspiracy to possess with intent to distribute narcotics, we will affirm the trial court unless the evidence viewed in the light most favorable to the Government, could not have persuaded an rational trier of fact of defendant's guilt beyond a reasonable doubt."

*United States v. Mayo*, 721 F.2d 1084, 1087 (7th Cir.1983). "Only when the record contains *no* evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied,* —

U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) (quoting *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985)).

■ This court has defined a conspiracy as "a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *Whaley*, 830 F.2d at 1473 (citations omitted). Once a conspiracy is shown to exist, "evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict." *United States v. Perlaza*, 818 F.2d 1354, 1359 (7th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987) (quoting *United States v. Xheka*, 704 F.2d 974, 988 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983)). *See also United States v. Shoffner*, 826 F.2d 619, 627 (7th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987); *United States v. Castillo*, 814 F.2d 351, 353 (7th Cir.1987). The government may meet its burden of proof through the introduction of circumstantial evidence, including the relationship of the parties, their overt acts and the totality of their conduct. *Id.* It must present "evidence to support the inference that the defendant in some way joined and participated in the conspiratorial scheme." *United States v. Garcia*, 562 F.2d 411, 414 (7th Cir.1977).

■ Counsel for Nesbitt argues in its brief that the evidence was insufficient to support his conviction under section 841(a)(1) or section 846 because "even assuming the evidence is sufficient to establish a conspiracy between James Nesbitt and Ana DaSilva ... [t]he evidence relating to Thomas Nesbitt is solely his presence at the New Carlisle residence, his use of the alias Michael Stein, the renting of the residence by a man using that name [the defendant notes that the landlord, Douglas Massey, was unable to identify the defendant as the person who rented the New Carlisle residence], and the fingerprint of Thomas Nesbitt on the bottle containing P2P found in the kitchen cabinet. Al-

though [as the defendant contends] the government made much of the presence of two stoves in the kitchen and the ominous presence of a kitchen hood over them, there was no evidence that the manufacture of P2P or any other controlled substance took place there or anywhere else." (Appellant's brief, at 13).

As noted above, "[a] conspiracy is a 'combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act.'" *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985) (quoting *United States v. Mayo*, 721 F.2d at 1088). Thus, the "essential elements of conspiracy under § 846 [of the Controlled Substance Act] are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act." *United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir.1982). The government "candidly admits" that the evidence tying Thomas Nesbitt to the conspiracy to manufacture methamphetamine was circumstantial—the government did not introduce the eye-witness testimony of any person who actually saw Thomas Nesbitt either manufacture P2P or conspire to produce methamphetamine. Nevertheless, "it is perfectly legitimate to prove a conspiracy by circumstantial evidence." *Griffin*, 827 F.2d at 1116. By its very nature, a conspiracy "is conceived and carried out clandestinely, and direct evidence of the crime is rarely available. Thus, circumstantial evidence from which the jury could reasonably infer the existence of an agreement is permissible." *Mayo*, 721 F.2d at 1088 (quoting *United States v. Washington*, 586 F.2d 1147, 1153 (7th Cir.1978)). *See also United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir. 1986) ("Circumstantial evidence is of equal probative value to direct evidence"). Not only is the use of circumstantial evidence permissible, but "circumstantial evidence 'may be the *sole support* for a conviction.'" *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) (quoting *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). "If the government proves its case by circum-

stantial evidence, 'it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' ... The trier of fact is free to choose among various reasonable constructions of the evidence." *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986). *See also* Wisconsin Jury Charge on Circumstantial Evidence No. 170 (1980). Moreover, it is well-settled that "once the government proves the existence of a conspiracy, the government need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *United States v. Gironda*, 758 F.2d 1201, 1217 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985). *See also United States v. Xheka*, 704 F.2d 974, 988–89 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed. 2d 682 (1983).

We thus consider whether the circumstantial evidence of Thomas Nesbitt's participation in the conspiracy to manufacture methamphetamine, when viewed in the light most favorable to the government, is sufficient to support a reasonable jury's finding of guilt beyond a reasonable doubt. The evidence adduced at trial to connect Thomas with the conspiracy included the testimony of Douglas Massey, the owner of the New Carlisle, Indiana, residence, DEA agents who executed the search warrant of the New Carlisle residence, and DEA chemist Terry Dal Cason. Massey testified that: (1) a man named "Michael Stein" (an admitted alias of Thomas') rented the New Carlisle, Indiana residence (Massey, however, claimed that he was unable to identify the defendant as the man who rented the apartment); and (2) an additional stove had been moved up from the basement to the kitchen and a ventilating hood (that was not there when Massey rented the apartment to "Michael Stein") had been installed in the kitchen of the residence. In addition to Massey's testimony, DEA agents present at the search scene confiscated a variety of chemicals and lab equipment, all of which DEA chemist Dal Cason testified were necessary components in the manufacture of methamphetamine. And as not-

ed, the kitchen of the apartment had been modified after the apartment was leased (a ventilation hood and an extra stove had been installed), making the kitchen ideal for the boiling and ventilation required to manufacture the drug. Recipes for the manufacture of amphetamine and methamphetamine were found in the defendant's New Carlisle, Indiana residence. In conjunction with Dal Cason's testimony, this physical evidence supports the inference that P2P and methamphetamine were produced at the New Carlisle residence. Further, the defendant's fingerprint on a bottle of P2P, and his personal papers (including a foreign work permit with the defendant's picture affixed thereto and payroll stubs for "Michael Stein") linked the defendant to both the apartment and the manufacture of the illegal drugs therein. Despite Massey's inability to identify the defendant as the "Michael Stein" who had rented the residence, other evidence provided a pellucid link between the defendant and his tenancy of the apartment. The defendant admitted to federal agents his use of the alias "Michael Stein." This, combined with the existence of the defendant's personal effects in the residence (the kinds of items normally associated with a permanent resident, as opposed to a casual visitor) is sufficient to justify the conclusion that the defendant in fact rented the apartment, thus tying him to the illegal activities that took place in the apartment.[7]

We recognize that in reviewing a guilty verdict based on circumstantial evidence, we must insure that the verdict does "not rest 'solely on the piling of inference upon inference'; but neither should we view every bit of evidence in isolation." *United*

*States v. Guzzino,* 810 F.2d 687, 696–97 (7th Cir.1987), *petition for cert. filed,* (March 27, 1987) (citing *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)). But "[t]he view that the prosecution's case must answer *all* questions and remove *all* doubts ... of course, is not the law because that would be impossible; the proof need only satisfy reasonable doubt." *Borum v. United States,* 380 F.2d 595, 599 (D.C.Cir.1967) (former Chief Justice Burger dissenting). Juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See Radtke,* 799 F.2d at 302. While "[c]ommon sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence." *Id.* Likewise, a reviewing court must "'use its experience with people and events [in determining] that the evidence correctly points to guilt [to guard] against the possibility'" of affirming a guilty verdict based solely on an "'innocent or ambiguous inference.'" *Redwine,* 715 F.2d at 319 (quoting *United States v. Kwitek,* 467 F.2d 1222, 1226 (7th Cir.), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972)).

In this case, a jury exercising well-reasoned judgment could very well conclude that the inculpatory inferences outweigh the exculpatory inferences that could be drawn from the evidence beyond a reasonable doubt. After reviewing all the evidence in a light most favorable to the government, we are satisfied that the jury could reasonably have concluded that the defendant participated in a conspiracy with

---

7. The defendant attempts to compare the evidence against Thomas Nesbitt to that adduced against Janet DiNovo in *United States v. DiNovo,* 523 F.2d 197 (7th Cir.), *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). In *DiNovo,* this court held that Janet's presence at her husband's (a co-defendant) trailer, which was found to contain heroin, was insufficient in itself to support her conviction for knowing possession of the heroin. In so holding, we expressly noted that "[t]here was no evidence to show that [Janet] owned the trailer," 523 F.2d at 201, and that "[u]nder the circumstances of this case we find that merely being Myron's wife is

not the kind of 'special relationship' justifying a finding of constructive possession ..." *Id.* The present case is readily distinguishable from *DiNovo* in that the government introduced direct evidence that Thomas Nesbitt possessed P2P (his fingerprint was on the bottle of P2P) as well as circumstantial evidence that, unlike Janet DiNovo, he was the person who rented the apartment from Douglas Massey. Thus, in contrast to the *DiNovo* case, the evidence against the defendant consists of far more than merely his presence at the New Carlisle residence where the manufacture of illegal drugs took place.

James Nesbitt and Ana DaSilva to manufacture methamphetamine in violation of section 846, and that the defendant manufactured P2P in violation of section 841(a)(1). The defendant's challenge to the sufficiency of the evidence is, *ergo*, without merit.

### IV. *The Speedy Trial Act and the Interstate Agreement on Detainers*

■ Nesbitt next challenges the district court's denial of his pre-trial motions to dismiss for failure to comply with the time limits imposed under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* Specifically, the defendant insists that the district court improperly excluded three main categories of time from the overall calculation of the net time that elapsed on his speedy trial clock. After a review of the time limitations imposed by the Act, we analyze *seriatum* the three categories of time excluded from the speedy trial calculation under the *de novo* standard of review. *United States v. Montoya*, 827 F.2d 143, 146 (7th Cir.1987).

■ "The Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (1982), was a legislative response to a perceived failure in the court system to adequately insure that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial....'" *Montoya*, 827 F.2d at 147 (quoting U.S. Constitution Amendment VI). Under the Act, the government must, with certain exceptions enumerated in § 3161(h), bring criminal defendants to trial within 100 days of their arrest and must indict a defendant within 30 days of his or her arrest. 18 U.S.C. § 3161(b). Further, the Act provides that:

"The trial of a defendant charged in an information or indictment with the commission of an offense shall commence within *seventy days* from the filing date (and making public) of the information or indictment, or from the date the defend-

ant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."

18 U.S.C. § 3161(c)(1) (emphasis added). Courts have construed the clause "appearance before a judicial officer" to mean the defendant's *initial* appearance before a judicial officer. *See, e.g., United States v. Owokoniran*, 840 F.2d 373, 374 (7th Cir. 1987); *United States v. Wilson*, 720 F.2d 608, 609 (9th Cir.1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984). Notwithstanding these statutory time limits, certain periods of delay are specifically excludable from both the seventy and thirty-day time periods under section 3161(h).

Nesbitt's initial argument is that § 3161(b)'s seventy-day time period began to run on October 29, 1984, the date of his first appearance before a judicial officer on charges of conspiracy to manufacture methamphetamine. He thus maintains that he should have been tried within seventy days of that initial appearance, and the court's subsequent grant of the government's motion to dismiss the criminal complaint without prejudice on November 20, 1984, may not serve to reset the ticking of the speedy trial clock to zero.[8]

The government, relying on the Sixth Circuit's decision in *United States v. May*, 771 F.2d 980 (6th Cir.1985), argues that the dismissal of the complaint without prejudice reset the speedy trial clock back to zero. Citing the legislative history of the Act, *May* held that "the clear purport of [section 3161(d)(1)] is to make the time periods in sections 3161(b) and (c)(1) run anew upon the issuance of a subsequent indictment; the prior filing of a complaint and arrest pursuant thereto is simply irrelevant for Speedy Trial Act purposes if the complaint is dismissed without prejudice." 771 F.2d at 982.[9] The Fifth, Eleventh and

---

**8.** This is really the wrong argument; because Nesbitt was not indicted within thirty days after his arrest, his contention should properly be that the failure to indict him within thirty days of his arrest (October 26, 1984) constitutes a Speedy Trial Act violation under section 3161(b). Our result is, however, the same re-

gardless of which section the defendant contends was violated. *See United States v. Samples*, 713 F.2d 298 (7th Cir.1983) (Indictment need not be returned within thirty days of arrest where initial charges are dismissed).

**9.** *May* quoted this part of the Act's legislative history in support of its ruling:

D.C. Circuits have also adopted this position. *See United States v. Hutchins*, 818 F.2d 322 (5th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 772, 98 L.Ed.2d 859 (1988); *United States v. Puett*, 735 F.2d 1331, 1333–34 (11th Cir.1984); *United States v. Bittle*, 699 F.2d 1201, 1205–07 (D.C.Cir.1983). We join these circuits in declining to construe the text of the Act as mandating that a criminal defendant be brought to trial within seventy days of his initial appearance when the trial court properly grants the government's motion to dismiss without prejudice. To accept the contrary would be to foreclose the government from ever having the ability to reevaluate a closed case, for whatever the reason, thereby defeating the very purpose of the dismissal *without prejudice* (which is to allow the government the opportunity to reevaluate its case and decide whether they wish to refile at a later date). This case in particular illustrates the need for allowing a dismissal without prejudice in the appropriate situation: the defendant was wanted in Nebraska (and subsequently convicted) on an outstanding murder warrant and the government was properly allowed to dismiss the federal complaint in light of the state's charges in order to give the government the opportunity to pursue the federal charges later. We therefore join with those circuits which have held that the prior dismissal of a complaint without prejudice has no impact upon the subsequent filing of an indictment for Speedy Trial Act purposes; consequently, the statutory time period begins to run anew from the issuance of a subsequent indictment. Thus, the earliest the seventy-day clock could begin to run is on the date of the subsequent indictment against Thomas Nesbitt, returned on November 28, 1984.[10]

The defendant also argues that the district court erred in granting the government's *ex parte* motion filed December 20, 1984, to exclude all time periods during which the defendant was unavailable to the federal court because of his involvement in state proceedings relating to his Nebraska murder charge. As noted by the government, the Act specifically excludes "any period of delay resulting from other proceedings concerning the defendant, including but not limited to ... delay resulting from trial with respect to other charges against the defendant ..." 18 U.S.C. § 3161(h)(1)(D). In *United States v. Montoya*, 827 F.2d at 149, we recently held that "[t]he delay resulting from trial with respect to other charges must necessarily encompass *preparations* for trial," which, as it is nigh unto impossible for a defendant to prepare for two judicial proceedings simultaneously, necessarily encompasses extradition proceedings while the defendant is confined to another jurisdiction. *Contra: United States v. Oliver*, 523 F.2d 253, 261 (2d Cir.1975) (Lumbard, J., concurring) (exclusion under section 3161(h)(1)(D) is limited to "the period when the defendant is actually on trial"). Although *Montoya* expressly did not reach the issue of "pre-trial delay resulting from pending state charges that could be so extreme that it threatens a defendant's Sixth Amendment right to a speedy trial," 827 F.2d at 150 n. 8, the defendant fails to argue that the length of the Nebraska proceedings was so inordinate as to independently constitute a Sixth Amendment violation. In any event, given the seriousness of the Nebraska murder charge (pending at the time the drug indictment was returned), we seriously doubt that such an argument would prevail under the circumstances of this case. Hence, in accordance with *Mon-*

---

"[Section 3161(d)(1)] allows latitude to the prosecutor to reinstitute prosecution of a criminal defendant whose case has previously been dismissed on non-speedy trial grounds without having to comply with the time limits imposed by the filing of the earlier complaint. To require a prosecutor to conform to indictment and trial time limits which were set by the filing of the original complaint in order to reopen a case on the basis of new evidence would be an insurmountable burden. Thus,

when subsequent complaints are brought, the time limits will begin to run from the date of the filing of the subsequent complaint."
S.Rep. No. 93–1021, 932 Cong.2d Sess. 33 (1974), 1974 U.S.Code Cong. & Admin.News, 7401.

**10.** Here, however, the defendant made his first appearance before a judicial officer on these charges on June 13, 1986. Thus, the speedy trial clock began to run as of this date.

*toya*, the trial court properly excluded the entire period from December 20, 1984, to his initial appearance on June 13, 1986,[11] the day the 70–day period commenced anew.

Pursuant to 18 U.S.C. § 3161(h)(1)(F), the trial court also excluded the period from July 1, 1986, until November 12, 1986, (5 days before trial) in order to allow the court to properly handle a variety of defense motions. This section excludes "any period of delay resulting from other proceedings concerning the defendant, including but not limited to ... (F) delay resulting from any pre-trial motion...." This court has noted that not only is a "proceeding on a pre-trial motion" one of the "other proceedings" to which § 3161(h)(1) refers, but also that any "time consumed in the *preparation* of a pre-trial motion must be excluded—provided that the trial judge has expressly granted a party time for that purpose." *United States v. Tibboel*, 753 F.2d 608, 610 (7th Cir.1985). In this case, the trial judge, upon the defendant's request, specifically excluded the period July 1, 1986 to July 23, 1986, for the purpose of allowing the defendant time to prepare his pre-trial motions. Thereafter, the court held four motion hearings on the multiple pre-trial defense motions ranging from motions to dismiss to suppression motions (the last of which was filed on October 15, 1986 pursuant to the defendant's requests for extension of time), finally ruling on these motions on November 12, 1986. Although

subsection (F) (under which this time was excluded) must be read together with subsection (J) (which specifies an outside time limit of 30 days for any matter under advisement), *Tibboel*, 753 F.2d at 611, we have recognized that multiple and sundry motions frequently create special problems for trial judges, problems Congress did not take cognizance of when enacting the legislation; thus, this circuit, along with others, realistically allows the judge to take more than 30 days to decide multiple pre-trial motions that raise complex issues. *United States v. Regilio*, 669 F.2d 1169, 1172–73 (7th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). *See also United States v. Brim*, 630 F.2d 1307, 1313 (8th Cir.1980), *cert. denied*, 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981). In such a case, the motions must be dispatched with "reasonable promptness." *Tibboel*, 753 F.2d at 612.

Under the circumstances of this case, where the defense filed literally dozens of motions, many raising complex issues, we hold that the judge did not exceed the bounds of "reasonable promptness" in taking more than 30 days to dispose of all the motions pending before the court (although we do note that the judge met the 30–day deadline with respect to the motions filed on October 15, 1986). Thus, the time period commencing July 1, 1986, and concluding November 12, 1986, was properly excluded under the terms of section 3161(h)(1)(F).[12] With this time excluded,

---

**11.** In excluding this period of time from the Speedy Trial Act calculation, we note that the district court did not rely on section 3161(h)(1)(D), but rather ruled that a continuance of the defendant's trial date was necessary in the interests of justice under section 3161(h)(8)(A). We do not believe that the court's failure to adjust this time period to fit the precise statutory slot creates reversible error.

**12.** The defendant makes the novel and legally unsupportable argument that these exclusions should not be applied due to the incompetence of his appointed counsel, Richard Keiser, who represented the defendant from July 2, 1986 until September 2, 1986. Nesbitt maintains that counsel's ineffectiveness is demonstrated by his unfamiliarity with the record (in particular

counsel's argument during a court hearing that the indictment should be dismissed for pre-indictment delay, which was contrary to the position of the defendant and his prior counsel, and his failure to obtain the defendant's permission before requesting extensions of time to file further motions). Initially we doubt that the alleged ineffectiveness of a defendant's attorney can prevent the exclusion of time otherwise properly excludable under § 3161(h)(1). The proper remedy for established ineffective assistance of counsel causing prejudice to the defendant is retrial; nowhere does the language or history of the Act provide the exception to excludable time urged by Nesbitt. But more importantly, the defendant has failed to demonstrate a Sixth Amendment violation based on the ineffectiveness of his second court-appointed attorney under *Strickland v. Washington*, 466

the non-excludable time between the defendant's initial appearance (June 13, 1986) and trial (November 17, 1986) comes to 22 days, well within the dictates of the Speedy Trial Act.

The defendant's final statutory challenge requires us to consider the government's compliance with Articles III and IV of the Interstate Agreement on Detainers, 18 U.S.C. App. § 2, Articles III, IV, passed by Congress in 1970.[13] Under Article III(a) of the Act:

"Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, *he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court* of the prosecuting officer's jurisdiction *written notice* of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: *provided,* that, for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

(Emphasis added). Article IV(c) provides: "In respect of any proceeding made possible by this article, *trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state,* but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

(Emphasis added). "Article IV requires commencement of the trial of the prisoner against whom a federal detainer[14] has been lodged within 120 days of the arrival

---

U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's decision to make a pre-indictment delay argument certainly falls short of establishing ineffectiveness merely because the argument failed or because previous counsel had not made the argument. And while communication with the client is important, counsel's failure to discuss the purely procedural tactic of requesting a time extension likewise does not implicate the Sixth Amendment. The defendant also argues that the trial court erroneously excluded the period from June 13, 1986, to July 14, 1986, because of (1) Congress' provision under § 3161(c)(2), that "trial shall not commence less than 30 days from the date on which the defendant first appears ..."; and (2) Rule 14 of the Local Rules of the Northern District of Indiana, which allows the defendant 10 days from the date of the arraignment to file pre-trial motions. According to the defendant, any time within such statutory or rule-imposed time periods may not be excluded under § 3161(h)(1)(A–J). This precise argument has been rejected twice by the Eleventh Circuit. *United States v. Campbell,* 706 F.2d 1138 (11th Cir.1983); *United States v. Mers,* 701 F.2d 1321 (11th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983). We agree with these cases that there is no support in the language of the Act or its legislative history for the interpretation that the § 3161(h) exclusions should not apply to the first 30 days of the 70–day period described in § 3161(c)(1). *Campbell,* 706 F.2d at 1140 and n. 3. The same holds true for the 10–day period for filing pre-trial motions under local rule 14.

13. The Interstate Agreement on Detainers was adopted by Congress for the United States government and the government of the District of Columbia. 18 U.S.C. at §§ 1–8. Identical provisions are adopted by the states, and each governmental unit adopting the provisions is responsible for developing rules and regulations for carrying out the provisions. 18 U.S.C.App. § 2, Article VII. According to Article I, the three purposes of the Act are: (1) to establish more "cooperative procedures" for interjurisdictional transfers; (2) to minimize the adverse effects of detainers on "prisoner treatment and rehabilitation"; and (3) to "encourage the expeditious and orderly disposition of [any outstanding criminal] charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints."

14. Recently, we noted that "[d]espite the obvious importance of the meaning of the term 'detainer' to [the Act's] administration, the Act does not define the term. The House and Senate reports accompanying Congress' adoption of the Act, however, define a 'detainer' as 'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' H.R.Rep. No. 1018, 91st Cong., 2d Sess. 2 (1970); S.Rep. No. 1356, 91st Cong., 2d Sess. 2, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4864, 4865." *United States v. Trammel,* 813 F.2d 946 (7th Cir.1987) (footnote omitted).

of the prisoner in federal custody pursuant to written request of the 'appropriate' federal officer (presumably the United States attorney), approved and transmitted by the district court." *United States v. Ricketson*, 498 F.2d 367, 373 (7th Cir.), *cert. denied*, 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974).

Nesbitt claims that on April 18, 1986, the day after his sentence in Nebraska state court, he sent a letter to the warden requesting a final disposition of the federal charges against him, thereby properly invoking Article III's 180–day requirement. Under Article III, subsection (b), a request of this nature is all that is required to invoke the 180–day provision:

> "(b) The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections, or other official having custody of him, who shall promptly forward it together with a certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested."

The government urges that Article III was improperly invoked because the warden failed to send notice of the defendant's request to the court as required under subsection (b) (the warden notified only the prosecutor, on April 28, 1986). While we doubt that the warden's failure to transmit the required notice can automatically operate to prevent a defendant's right to attempt to invoke Article III when the defendant to the best of his ability has complied with his or her obligations under subsection (b),[15] we need not consider this issue in light of our conclusion *infra* that the defendant's prosecution met Article III's substantive requirements.

Assuming as the defendant argues, that the defendant properly invoked Article III's 180–day requirement, he should have been brought to trial by October 26, 1986 (180 days from April 28, 1986, the date the prosecutor received notice of the defend-

ant's request for a final disposition of the federal charges). Further, under Article IV, the defendant should have been brought to trial even earlier, on October 11, 1986—120 days from the defendant's arrival in federal custody on June 11, 1986. Nesbitt states that the district court erred in refusing to dismiss the federal charges because he was not brought to trial until November 17, 1986, weeks after the expiration of Art. III and IV's time limits.

But the defendant's construction ignores Article III(a)'s (and Article IV's) provision for the granting of a " 'necessary or reasonable continuance,' as well as Article VI(a)'s provision that the running of the 120–day time period shall be tolled whenever and for as long as the prisoner is unable to stand trial...." *See United States v. Roy*, 830 F.2d 628, 634–35 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988) (discussing the distinction between the tolling provisions of Article III(a) and Article VI(a)). The Second Circuit has interpreted the language "unable to stand trial" as excluding "all those periods of delay occasioned by the defendant." *United States v. Roy*, 771 F.2d 54 (2d Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986); *United States v. Scheer*, 729 F.2d 164, 168 (2d Cir.1984). In the case at hand, we hold that both the district court's grant of a continuance on September 30, 1986, as well as the periods of delay occasioned by the multiple motions filed on behalf of the defendant, operate to toll the running of Articles III and IV as of the court's September 30, 1986, motion hearing, at the latest. Based upon our review of the record, we agree with the trial judge's conclusion that the time limits contained in Articles III and IV were properly tolled under the Interstate Act on Detainers. Since the earliest of these time limits (Article IV's 120–day period) did not expire until October 11, 1986, the defendant was brought to trial timely under the Act's provisions.

**15.** Although Article III, subsection (b) imposes a statutory duty upon the warden to transmit notice of the prisoner's request for final disposition to the court, we hasten to point out that the warden of a state prison is not an arm of the court, and thus could not be held legally responsible for any failure to transmit the required notice.

## V. *Right to Compulsory Process*

 The defendant maintains that the district court's deportation of Ana DaSilva to her native country, Brazil, violated his Sixth Amendment right to compulsory process for securing the presence of witnesses in his favor since Ana could have provided material evidence in the defendant's trial. Ana, who was indicted (on Nov. 28, 1984) with the defendant on charges of conspiracy to manufacture methamphetamine, pled guilty on February 5, 1985. Subsequently, on March 15, 1985, the district court sentenced Ana to a term of one year imprisonment to be followed by a one-year period of probation, but suspended the sentence on the condition that she depart the United States forthwith and never return. The government, however, failed to take any steps to preserve her testimony for later use during Nesbitt's trial (such as procuring her deposition), and Ana was deported shortly thereafter. During this entire period, Thomas Nesbitt was held in the custody of Nebraska officials on the murder charge against him; further, neither he nor his attorney was present at the deportation hearing to protect his interest in securing Ana's testimony. We are asked to determine whether Ana's deportation deprived the defendant of his right to compulsory process as guaranteed by the Sixth Amendment.

The Sixth Amendment to the United States Constitution guarantees an accused the right to "compulsory process for obtaining *witnesses in his favor.*" U.S. Const. amend. VI (emphasis added). Implicit in the language of the Sixth Amendment italicized above is the conclusion that more than the mere absence of a witness's testimony is necessary to establish a violation of the right to compulsory process. Indeed, in *Washington v. Texas*, 388 U.S. 14, 16, 87 S.Ct. 1920, 1922, 18 L.Ed.2d 1019 (1967), the Supreme Court held that a violation of this clause occurs only when the defendant was arbitrarily deprived of "testimony [that] would have been *relevant* and *material* and ... *vital* to the defense.*" (Emphasis added).

*United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982) holds that in light of Congress' strong interest in the prompt deportation of illegal aliens who are also witnesses to a crime, the deportation of such a witness prior to a defendant's trial does not violate the Sixth Amendment where the defendant fails to establish that the witness possesses evidence that is both material *and* favorable to the defense.[16] Drawing upon both this policy and the language of *Washington*, the Court stated that:

> "This language [of *Washington*] suggests that respondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of the [witnesses] de-

---

**16.** The court explained that:

"In addition to satisfying immigration policy, the prompt deportation of alien witnesses who are determined by the government to possess no material evidence relevant to a criminal trial is justified by several practical considerations. During fiscal year 1979, almost one-half of the more than 11,000 inmates incarcerated in federal facilities in the Southern District of California were material witnesses who had neither been charged with nor convicted of a criminal offense.... The average period of detention for such witnesses exceeded five days, and many were detained for more than twenty days.... The resulting overcrowding conditions forced the government to house many detainees in federal facilities located outside the Southern District of California or in state-operated jails.... Thus, the detention of alien eyewitnesses imposes substantial financial and physical burdens upon the government, not to mention the human costs to potential witnesses who are incarcerated though charged with no crime.... As explained by the United States: 'Because of budget limitations and the unavailability of adequate detention facilities, it is simply impossible as a practical matter to prosecute many cases involving the transportation or harboring of large numbers of illegal aliens, where all the aliens must be incarcerated for a substantial period of time to avoid dismissal of the charges, even though the prosecution's case may be overwhelming. As a consequence, many valid and appropriate prosecutions are foregone.'

It simply will not do, therefore, to minimize the government's dilemma in cases like this with statements such as "[t]he prosecution may not deny access to a witness by hiding him out." 458 U.S. at 865–66, 102 S.Ct. at 3445.

prived him of their testimony. *He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.*"

*Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. at 3446 (footnote omitted). A showing by the defendant that the deported witness's testimony would be both material and furthermore favorable to his defense is therefore essential to his success in establishing a violation of his right to compulsory process. *Johnson v. Chrans,* 844 F.2d 482 (7th Cir.1988), *petition for cert. filed,* (May 22, 1988); *United States v. Davis,* 772 F.2d 1339, 1348 (7th Cir.), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985).

In defining the contours of this standard of materiality, the Supreme Court in *Valenzuela–Bernal* borrowed language from other cases involving "what might loosely be called the area of constitutionally guaranteed access to evidence...." 458 U.S. at 867, 102 S.Ct. at 3446. For instance, the Court adopted this statement of the materiality standard from *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976), the case expounding on the rule set forth in *Brady v. Maryland,* 373 U.S. 83–87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.":

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt, whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."

Thus, under *Valenzuela–Bernal,* the defendant "can establish no Sixth Amendment violation without making some plausible explanation of the assistance he would have received from the testimony of the deported witnesses." 458 U.S. at 871, 102 S.Ct. at 3448.[17] See *United States v. Fountain,* 768 F.2d 790, 796 (7th Cir.1985), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986) ("testimony that could not reasonably be expected to make a difference to the outcome of the trial is not necessary" to an adequate defense under Fed.R.Crim.P. 17(b)); *Sharlow v. Israel,* 767 F.2d 373, 377 (7th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986) (excluded evidence must be "critical" to the defendant's defense).

---

17. *Valenzuela–Bernal* also suggests, however, that the detail with which a defendant must describe the assistance a deported witness would provide depends in part upon the defendant's ability to determine precisely what favorable evidence the witness possesses. The Court noted that:

> "[b]ecause prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess, however, the defendant cannot be expected to render a detailed description of their lost testimony. But this does not, as the court of appeals concluded, relieve the defendant of the duty to make some showing of materiality. Sanctions may be imposed on the government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways

not merely cumulative to the testimony of available witnesses. In some cases such a showing may be based upon agreed facts, and will be in the nature of a legal argument rather than a submission of additional facts. In other cases the criminal defendant may advance additional facts, either consistent with facts already known to the court or accompanied by a reasonable explanation for their inconsistency with such facts, with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense. Because in the latter situation the explanation of materiality is testimonial in nature, and constitutes evidence of the prejudice incurred as a result of the deportation, it should be verified by oath or affirmation of either the defendant or his attorney."

458 U.S. at 873–74, 102 S.Ct. at 3449–50 (emphasis added; footnotes omitted).

The defendant claims that Ana would have been able to produce evidence substantiating his defense had she been available to testify, arguing that her testimony would meet the *Valenzuela–Bernal* standard because, *inter alia*, she would have essentially corroborated Thomas Nesbitt's testimony in the following three areas: (1) the alleged improper execution of a search warrant on the New Carlisle, Indiana, residence (but the defendant does not raise this issue on appeal as an independent ground for reversal under the Fourth Amendment); (2) Nesbitt's testimony that DEA agents tampered with evidence during the search of the residence; and (3) Nesbitt's defense that he was unaware that the chemicals and equipment found in the residence were being used to manufacture illegal drugs.

Although the defendant broadly asserts that Ana would corroborate his testimony in these areas, the record neither supports his assertion that Ana would in fact so testify nor his argument that the testimony would meet the *Valenzuela–Bernal* standard of materiality. With regard to the allegedly improper search of the New Carlisle residence, even assuming Ana were to testify that agents broke down the door to the house without first knocking or announcing their presence, this testimony would merely be cumulative of the defendant's. Thus, the testimony would serve only to provide a conflict with the agents' testimony that they in fact knocked before entering, as well as the physical evidence that there was no damage to the door of the house (photographs taken of the front of the house following the search revealed no evidence of damage to the front door). As such, even assuming that Ana's testimony would support the defendant's improper search claim, the testimony falls far short of being "critical" to the defense. Similarly, there is absolutely nothing in the record to bolster the defendant's claim that Ana would testify that DEA agents tampered with evidence. Indeed, it is interesting to

note that if she could have, it would be expected that Ana would in all probability have raised such an important contention on her own behalf prior to pleading guilty to the manufacture of illegal drugs. Yet she failed to mention this very serious claim and valid defense in either her pre-trial motions or in her testimony before the court during her change of plea hearing.[18] And again, even were she to testify that DEA agents tampered with evidence, several agents who were present at the scene testified to the contrary. Since her testimony would merely contradict the testimony of the federal agents present at the search scene, it is inconceivable that her testimony would meet the strict standard of materiality set forth in *Valenzuela–Bernal*.

Finally, the defendant fails to make even a plausible showing to bolster his bald and unsupported assertion that Ana would provide material evidence that he was unaware that illegal drugs were being manufactured at the New Carlisle residence. The defendant claims that Ana would have testified that she told the defendant she was merely preparing asthma medicine with the chemicals found in the house. But the actual materials found in the house (including a recipe for making amphetamines) as well as the testimony of DEA chemist Dal Cason (that many of these chemicals were dangerous and would only be used to manufacture illegal drugs) undermined the plausibility of the defendant's plea of ignorance. Moreover, the defendant's theory of defense was presented to the jury, which properly rejected the defendant's arguments. Even assuming Ana's testimony would have provided support for the defendant's theory, her merely cumulative testimony could not be so crucial to the defense that it would "be expected to make a difference to the outcome of the trial."

We observe that Ana's deposition could easily have been taken prior to her deporta-

---

18. We note that Ana's unsworn statements during her change of plea hearing that essentially inculpated the defendant are, by their nature, suspect and should not be accorded undue weight. Nevertheless, even discounting her statements at that hearing, we find nothing in the record that satisfies the defendant's burden of demonstrating that Ana would provide material *exculpatory* evidence.

tion, thus preserving her testimony for trial. In many cases where an eyewitness to a crime must be deported prior to the defendant's trial, the taking of the witness's deposition will not only preserve the witness's testimony (both inculpatory and exculpatory), but also will prevent a reoccurrence of the Sixth Amendment problem presented here. Moreover, we observe that the failure to preserve the the testimony of an illegal witness who is under subpoena may present a more serious Sixth Amendment issue. Nevertheless, we decline to hold that the government's failure to procure Ana's (who was not under subpoena) deposition testimony prior to her deportation constitutes reversible error under the circumstances of this case. As explained above, the defendant failed to meet his burden of demonstrating that Ana's testimony would have been both material and favorable to his defense. The defendant's Sixth Amendment challenge is therefore without merit.

## VI. *Destruction of Evidence*

■■■■ Some two weeks after the search of the New Carlisle, Indiana, residence and the recovery of the chemicals found in the house, two DEA agents contacted Assistant United States Attorney Donald Moroz to inquire as to whether the chemicals were too dangerous to be stored and whether they should be destroyed. Moroz testified that he told the agents he had no problem with destroying the chemicals, although he would have to obtain the court's permission before allowing them to do so. But according to the agents' testimony, they erroneously interpreted Moroz's remarks during their conversation as permission to destroy the chemicals. Thus, on November 5, 1984, the agents proceeded to destroy the various chemicals recovered from the New Carlisle residence without obtaining the court's permission (the P2P recovered at the residence was, however, preserved).[19] The defendant insists that the destruction of this evidence violated his

rights under the Due Process Clause of the Fourteenth Amendment.

It is indeed unfortunate and careless that government agents destroyed tangible evidence relating to a pending criminal prosecution when it later developed that many of the chemicals destroyed were not dangerous and could have been stored safely for long periods of time. On the other hand, we do recognize that oftentimes there are dangerous chemicals which must be destroyed for safety reasons. The problem in this case was one of miscommunication resulting in a bad judgment; however, in a similar scenario we noted that "such a lack of communication is without justification." *United States v. Shafer*, 445 F.2d 579, 581 (7th Cir.), *cert. denied*, 404 U.S. 986, 92 S.Ct. 448, 30 L.Ed.2d 370 (1971).

Nevertheless, we are not persuaded that the destruction of the chemicals mandates reversal of the defendant's conviction under the circumstances of this case. Recently, this court noted that "the loss or destruction of evidence does not implicate the Due Process Clause of the Fourteenth Amendment absent 'official animus' or a 'conscious effort to suppress exculpatory evidence.'" *United States v. Zambrana*, 841 F.2d 1320, 1341–42 (7th Cir.1988) (quoting *California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984)). Moreover, in addition to the bad faith element, the destroyed evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488–89, 104 S.Ct. at 2534. Here, the agents' destruction of chemicals fail both the bad-faith and the materiality prongs set forth in *Trombetta* as necessary to constitute a Fourteenth Amendment violation.

Initially, there is no hint of bad faith on the part of the government agents who destroyed the chemicals. The defendant does not mount a challenge to the district

---

19. At the defendant's preliminary hearing on November 8, 1984, (three days after the chemicals were destroyed), the presiding magistrate requested the government to file a motion requesting the court's permission to destroy the chemicals confiscated from the New Carlisle,

Indiana, residence. Neither the magistrate nor any of the attorneys present, however, were aware at the time that the issue was actually moot since the chemicals had already been destroyed.

court's factual finding that the government agents merely misinterpreted the Assistant United States Attorney's instructions regarding the destruction of the chemicals. At best, the agent's actions were negligent —far short of *Trombetta*'s bad faith standard. Second, photographs were taken of the chemicals in their containers prior to their destruction, and the government made available for testing by the defense samples of P2P seized at the residence. Thus, we do not agree that the defendant suffered concrete prejudice as a result of the destruction of the remaining chemicals.

### VII. *Sentencing*

The defendant lastly challenges the length of his sentences on the ground that the sentences imposed were unfair in comparison to those of his co-defendants, Ana DaSilva and James Nesbitt. The judge sentenced Thomas Nesbitt to a term of five years imprisonment on each count of the indictment, while Ana and James received sentences of ten and eleven days imprisonment, respectively. In rendering his sentence, the judge stated:

> "Thomas Edward Nesbitt was not a peripheral character in this operation. And that is critical. That is critical to the entire process. I think that the evidence supports an inference of being the rather behind the door mastermind of the operation of this manufacturing process, illicit and illegal manufacturing process, criminal manufacturing process. I think the evidence reasonably leads one to that conclusion. So I respectfully disagree that he is peripheral. But that finding and that conclusion is central to the final decision. I emphasize again that that is the critical factor and nothing else that Mr. Nesbitt has done either by exercising his rights or the tactics that he has chose to do that."

The defendant insists that the judge's characterization of Thomas as the "behind the door mastermind" of the drug operation is wholly unsupported by the evidence proper-ly *introduced at trial;* thus, he requests this court to remand for resentencing. The defendant's argument, however, ignores the fact that the trial judge may appropriately rely on information beyond the scope of the evidence produced at trial, including information contained in the defendant's pre-sentence report and information obtained during the plea hearings of co-defendants, when imposing sentence. *Cf. Serapo v. United States*, 595 F.2d 3 (9th Cir.1979) (Sentencing judge may consider information obtained from trials of co-defendants); *United States v. Scalzo*, 716 F.2d 463, 469 (7th Cir.1983) (Reliance upon hearsay and other types of inadmissible information in assessing the factors affecting punishment is not *per se* improper); *United States v. Cusenza*, 749 F.2d 473, 478 (7th Cir.1984) (Sentencing judge "may properly consider hearsay evidence of other criminal activity by the defendant, in some cases even if the defendant has pleaded not guilty to related charges."). The Supreme Court has repeatedly held that "a trial judge in the federal judicial system generally has wide discretion in determining what sentence to impose ..." and "before making that determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972).[20] The Court has further explained that "once the guilt of the accused has been properly established, the sentencing judge, in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics." *Williams v. Oklahoma*, 358 U.S. 576, 584, 79 S.Ct. 421,

---

**20.** "We have noted that district courts are allowed to consider the defendant's juvenile record, *see United States v. Madison*, 689 F.2d 1300, 1315 (7th Cir.1982), as well as the defendant's criminal record in general, *see, e.g., United States v. Hoffman*, 806 F.2d 703, 714 (7th Cir. 1986), when imposing sentence." *United States v. Kovic*, 830 F.2d 680, 689 n. 13 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 778, 98 L.Ed.2d 864 (1988).

426, 3 L.Ed.2d 516 (1959). Consequently, even assuming *arguendo* that the evidence adduced at trial standing alone fails to support the finding that Thomas played a central role in the scheme to manufacture illegal drugs (we do not intimate that it does), the entire record, including Ana and James's testimony during their guilty plea hearings, supports the judge's factual conclusions.[21]

This circuit has noted on more than one occasion that " '[a] sentence which is within the limits established by statute under which it is imposed will not be vacated upon review unless the sentencing judge relied upon improper considerations or unreliable information in exercising his discretion or failed to exercise any discretion at all in imposing the sentence.' " *United States v. Ford,* 840 F.2d 460, 466 (7th Cir. 1988) (quoting *United States v. Harris,* 761 F.2d 394, 402–03 (7th Cir.1985)). Thus it is settled law in this circuit that "a defendant who argues *disparity alone* has not made out a claim of an improper exercise of the district court's discretion, let alone a claim that no discretion at all had been employed ... Only when a judge imposes disparate sentences on similar defendants without explanation does even an inference of impropriety arise." *United States v. Neyens,* 831 F.2d 156, 159 (7th Cir.1987) (emphasis added).

In the case at bar, the district judge explained that he had decided to impose disparate sentences on the ground that Thomas' role in the scheme to manufacture methamphetamine was more extensive than that of his codefendants. The evidence adduced at trial, combined with Ana and James' statement that Thomas played a central role in the conspiracy, supports the judge's characterization of Thomas as the "mastermind" of the drug manufacturing scheme. And of equal importance, the defendant was afforded every opportunity to attempt to rebut the government's allegation that Thomas was the key figure in the criminal scheme. *Cusenza,* 749 F.2d at 478; *Scalzo,* 716 F.2d at 469. We have long recognized that "considerations of the extent and nature of a defendant's role in a scheme is a sound basis for disparate sentences among co-defendants." *Neyens,* 831 F.2d at 159. *See also United States v. Santiago,* 582 F.2d 1128, 1137 (7th Cir. 1978). Given the factual basis in the record for the trial judge's conclusion that Thomas Nesbitt's activities were not only crucial to the ultimate success of the conspiracy, but also that he was the "mastermind" of the scheme, we refuse to hold that the judge's sentencing decision was devoid of the type of thoughtful consideration required to ensure that the punishment imposed on the defendant fits his individual crime.

The defendant's convictions and sentences are

AFFIRMED.

---

21. For instance, Ana DaSilva testified at her plea hearing that:

"I came here with him [the defendant] and after some time he decide laboratory for make amphetamines. And he told me for asking him to buy the chemicals and the glasses and everything for the laboratory and make amphetamines."

