Gary Arland MITCHELL,
Petitioner–Appellant,

v.

Bob GOLDSMITH, Deputy Warden;
Arizona Attorney General,
Respondents–Appellees.

No. 87–2134.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 14, 1989.

Decided June 30, 1989.

J. Douglas McVay, Phoenix, Ariz., for petitioner-appellant.

Bruce M. Ferg, Asst. Atty. Gen., Tucson, Ariz., for respondents-appellees.

Before BRUNETTI, KOZINSKI and NOONAN, Jr., Circuit Judges.

## OPINION

BRUNETTI, Circuit Judge:

Gary Arland Mitchell, convicted of sexual assault by an Arizona state court, appeals the denial of his petition for writ of habeas corpus. We affirm.

Appellant was indicted on three counts of sexual assault in violation of A.R.S. § 13–1406 and one count of attempted sexual assault in violation of A.R.S. §§ 13–1001 and 13–1406. Count three, attempted sexual assault, was dismissed by the state and appellant was tried separately on counts one and two. He was found guilty by a jury of count one and not guilty by separate jury in a separate trial on count two. He pled guilty to count four. Both convictions were affirmed by the Arizona Court of Appeals, *State v. Mitchell,* 140 Ariz. 551, 683 P.2d 750 (Ct.App.1984); and the Arizona Supreme Court denied review. Mitchell then filed a petition for writ of habeas corpus in the district court, which was denied. The case was taken under submission on April 12, 1988 and this court directed that counsel be appointed to represent Mitchell who thereafter filed a supplemental opening brief. The United States Supreme Court granted the state's petition for writ of certiorari in *Arizona v. Youngblood,* —— U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). This court granted a

motion to stay this appeal pending the outcome of *Youngblood.* The state submitted a supplemental answering brief after the *Youngblood* decision was rendered. Pursuant to this court's order, the appellant filed a supplemental brief discussing the impact, if any, of the *Youngblood* decision on this case.

### Background

On July 2, 1981, at approximately midnight the victim was awakened by the doorbell. The victim opened the door and let the appellant into the house after he identified himself as Gary, a friend of her roommate. 683 P.2d at 752. The appellant obtained a knife from the kitchen, threatened to kill the victim, and then raped her. During the attack the victim saw the appellant's face and noticed that he was wearing an earring in his left ear. *Id.*

After the rape a swab was utilized to collect a vaginal sample and a slide was made and sent to Edward Heller, a criminalist at the Tucson Police Department Crime Lab. *Id.*

The victim was shown one physical lineup and three photographic lineups. In the first three lineups, one of which was the physical lineup, the victim did not see the appellant, and, in fact, the appellant was not in any of these lineups. During the fourth lineup, the victim immediately picked out appellant's photograph and identified him as the assailant.

Two of the earlier photographic lineups shown to victim were lost. Neither of the lost lineups contained a photograph of appellant and neither of the lineups resulted in an identification of the assailant.

Appellant was arrested on September 29, 1981, approximately three months after the incident. At trial the victim positively identified the appellant as her attacker. *Id.*

The criminalist's examination of the slide revealed the presence of sperm; blood and saliva samples taken from the appellant and the victim showed that the appellant was a group O secretor, the victim a group B secretor and that the semen sample came from a group O secretor.

The criminalist testified that semen can be analyzed by breaking it down into its PGM enzyme types; PGM 1 is found in 58 percent of the population, PGM 2–1 is found in 36 percent, and PGM 2 is found in 6 percent of the population. However, at the time Heller performed the secretor test on the semen his lab at the Tucson Police Department did not have the capability of performing a PGM enzyme analysis; according to the policy of the Tucson Police Department a semen sample was to be sent to the FBI to perform a PGM analysis only when a suspect had been identified. The PGM enzymes in a semen sample last three to six months if refrigerated, otherwise the enzyme deteriorates within a month.

In seeking habeas corpus relief Mitchell asserts that the state's failure to preserve a semen sample for future PGM enzyme testing and the state's failure to perform a PGM analysis on the sample denied him due process of law; appellant also asserts that he was denied due process of law by the state's loss of the two pretrial photographic lineups.

■ The decision whether to grant or deny a petition for habeas corpus is reviewed de novo. *Weygandt v. Ducharme,* 774 F.2d 1491, 1492 (9th Cir.1985). In reviewing a district court's denial of a habeas corpus petition, state court factual conclusions are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

### Discussion

A. "Lost" Semen Sample.

■ According to the state, the Supreme Court decision in *Arizona v. Youngblood* compels a conclusion that the appellant's due process rights have not been violated. —— U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). We agree.

According to the Court in *Youngblood,* the failure of a state to preserve evidence "of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant," is not a denial of due process of the law "unless a criminal defendant can show bad faith on the part of the police." *Id.*

109 S.Ct. at 337. In that case, the police collected the rectal swabs and the clothing on the night of the crime; defendant was not taken into custody for six weeks. "The failure of the police to refrigerate the clothing and to perform tests on the semen sample can at best be described as negligent." *Id.* The evidence—"such as it was"—was made available to the defendant. There was no suggestion of bad faith on the part of police and hence no violation of the Due Process Clause. *Id.*

Mitchell does not complain that the state did not disclose relevant police reports, which contained the relevant information about tests performed on the sample and the victim's examination at the hospital. Accordingly, *Brady* does not apply to this case. Rather, Mitchell complains that the state's failure to preserve a semen sample denied him the opportunity to perform a PGM enzyme analysis which could have provided potentially exculpatory evidence.

Contrary to appellant's contention, the fact that the PGM analysis would have been performed had the semen sample been preserved is not evidence that the police acted in bad faith. First, Mitchell was not identified in the photographic lineup until after his arrest on September 27, 1981, approximately three months after the semen sample was collected. The police did not know whether the semen sample would have exculpated Mitchell when they failed to perform further testing and when they failed to refrigerate the sample. Second, the police followed departmental procedure in not sending the sample to the FBI given the fact that no suspect had been identified; the police department itself lacked the capability to perform the tests. Thus, the police were acting in accord with their normal practices and had no constitutional duty to perform any particular test. *Youngblood,* 109 S.Ct. at 338 (police are free to use or not to use any particular investigatory tool).

Next, appellant contends that the *Youngblood* bad faith standard does not apply to this case because the state made use of the results of the ABO blood group testing in its case in chief. In *Youngblood,* the state

"did not attempt to make any use of the materials in its own case in chief." 109 S.Ct. at 336. Although unclear, the appellant appears to be arguing that the three-step analysis described in *Trombetta* should therefore be applied to this case. *California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984).

Appellant's contention is erroneous. The state did not present evidence of the results of a PGM enzyme analysis in its case in chief. The state did present the results of the ABO blood group testing. Mitchell was free to emphasize to the finder of fact that 40% of the black population had the same blood group secretor as Mitchell and to present any contrary evidence of his actual ABO blood type.

Even under *Trombetta,* however, the appellant must show that the police did not act in good faith. In this case, the police did not know "the semen samples would have exculpated [Mitchell] when they failed to perform certain tests or refrigerate [certain samples]", *Youngblood,* 109 S.Ct. at 336–37 n. 1; hence there was no bad faith on the part of the police.

"Since there is no evidence to support a finding of bad faith on the part of the police and 'failure to preserve potentially useful evidence does not constitute a denial of due process of law,' appellant's due process rights were not violated." *Id.* at 337.

**B. "Lost" Photo Lineups.**

■ Two photographic lineups shown to the victim prior to the time appellant was arrested were lost. In both lineups, the appellant's picture was not included and the victim failed to identify anyone in the lineup as being the assailant. Because the victim failed to identify anyone in the lineup the lost evidence was irrelevant; the lost evidence was not exculpatory making *Brady* inapplicable and was not even "potentially useful" evidence making *Youngblood* inapplicable. However, even if the evidence was potentially useful, the state record fails to support a finding of bad faith on the part of police. Although the loss of the photographs may have been

negligent, the record does not support a finding of bad faith. In the absence of bad faith, failure to preserve the lineups does not constitute a denial of due process of law. *Youngblood,* 109 S.Ct. at 336.

### C. Fourth Amendment Claims.

■ Appellant contends that the state seized hair, blood and saliva samples from him in violation of the Fourth Amendment. In *Stone v. Powell,* the U.S. Supreme Court determined that "where the state has provided an opportunity for a full and fair litigation of a Fourth Amendment claim," habeas corpus relief cannot be granted. 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976).

Mitchell filed a motion to suppress, and the trial court denied the motion after a hearing. Accordingly, Mitchell had a full and fair opportunity to argue his Fourth Amendment claim in state court. Furthermore, Mitchell did not appeal this aspect of his state conviction in state court and is precluded from raising it now. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

### D. Identification Procedures.

■ Mitchell contends that the pretrial identification procedures were unduly suggestive and improperly tainted the victim's in court identification of him. Mitchell contends he was the only person in the lineup who was photographed against a blue background; four of the seven individuals in the photographic lineup had lighter complexions than his; and appellant's photo was the only photo with a 1981 date (the other photographs had arrest dates of 1979 or 1980). Thus, Mitchell argues that his picture "stood out".

The district court reviewed the photo lineup and noted that the background colors varied among all the pictures, the dates on the photographs were not suggestive and at least two of the other men in the lineup closely resembled Mitchell. We agree. The various background colors among the photographs and the 1981 date on Mitchell's photo does not make the lineup unduly suggestive.

■ Even if unduly suggestive, the victim's in-court identification of Mitchell have other indicia of reliability: the victim observed the appellant in adequate lighting and in close proximity for several minutes. Thus, under the totality of the circumstances, there was no constitutional defect in the victim's in-court identification of Mitchell as the rapist. *See Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

### E. Closing Argument.

Mitchell contends that certain prosecutor's comments were based on matters not entered into evidence. Specifically, he objects to the prosecutor's prediction about what would have happened if the semen samples had been preserved. The prosecutor said, in part: "I would submit to you that even if the crime lab was able to analyze those enzymes it would've come back being the same enzyme group that [Mitchell] is." According to Mitchell, there was no evidence as to what the result of a PGM enzyme analysis would have been as the semen had been destroyed. But the prosecutor was not saying that the enzyme test in fact showed Mitchell to be the assailant. Rather, he was asking the jury to draw that inference based on the rest of the evidence and was attempting to counter appellant's argument that because of the loss of the evidence it could be inferred that the results would have shown Mitchell was not the rapist.

■ Mitchell also contends that it was fundamentally unfair and prejudicial for the prosecutor to argue:

His big complaint in this area is how would you feel if you were Gary Mitchell and you're on trial for a case like this and the enzymes were lost. I would just like to give you the converse of that and say how would you feel if you were Cheryl Morrison and you picked out the man that raped you and you said this is him, there is no doubt in my mind about that, and the jury found the guy not guilty just because the police didn't refrigerate those enzymes? How would

that feel? That would be a miscarriage of justice if that were the case, if Cheryl Morrison had to find out this man was found not guilty just because the police had not refrigerated those enzymes.

The defendant did not object to this statement until the jury had retired. These comments by the prosecutor were made in response to appellant's closing argument:

> How would you like to be sitting at the defense table charged with a crime, there's no physical evidence. You've got an eye witness. That's the sum total of the evidence. You can't really cross-examine them. How would you like to be sitting there thinking the police could have put something in a plastic bag and saved it for a couple of months and that could prove your innocence? You can't get at it. What would you be feeling right now?

On this record the prosecutor's statement cannot be said to rise to the level of plain error warranting a court to overlook the absence of any objection by defense. *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). Although inappropriate and probably amounting to error, the remarks were not such as to undermine the fundamental fairness of the trial. *Id.* at 17, 105 S.Ct. at 1047.

F. "Lost Evidence" Jury Instruction.

 Over the defense objection, the court instructed the jury:

> If you find that the plaintiff, the State of Arizona, has destroyed, caused to be destroyed, or allowed to be destroyed any evidence whose contents or quality are an issue, you may infer that the true fact is against their interests.

Essentially, Mitchell contends that this instruction varied from Arizona case authority; Mitchell does not contend that the instruction violated federal constitutional standards. In the absence of a federal constitutional violation, no relief can be granted even if the instruction given might not have been correct as a matter of state law.

Accordingly, the district court's denial of appellant's petition for writ of habeas corpus is

AFFIRMED.