**Andre JONES, Petitioner,**

v.

**Gary McCAUGHTRY, Superintendent, Waupun Correctional Institution, Respondent.**

**No. 90–C–183–C.**

United States District Court, W.D. Wisconsin.

Feb. 15, 1991.

Mary E. Waitrovich, Office of State Public Defender, Madison, Wis., for petitioner.

Gregory M. Posner–Weber, Asst. Atty. Gen., Madison, Wis., for respondent.

**ORDER**

CRABB, Chief Judge.

Petitioner has filed objections to the report and recommendation entered herein by the United States Magistrate Judge on Jan-

uary 24, 1991, in which the magistrate judge recommended denial of this petition for a writ of habeas corpus.

Based on my review of the objections, the report and recommendation, and the parties' briefs, I agree with the magistrate judge that petitioner has failed to show that his due process rights under the United States Constitution were violated by the destruction of the sperm specimen in the hospital laboratory. I agree with the magistrate judge's discussion of the constitutional issues. I have some reservations about the discussion of the state action claim because I am less sure than he is that the issue is a matter of law rather than of fact. See generally discussion of what is law and what is fact in *Mucha v. King*, 792 F.2d 602 (7th Cir.1986). If the issue is one of fact, considerable deference must be accorded the state court's determination. 28 U.S.C. § 2254(d).

Because it is not necessary to resolve the question of the characterization of the state action issue in light of the resolution of the due process issue in respondent's favor, I will leave it to another day.

## ORDER

IT IS ORDERED that the report and recommendation of the United States Magistrate Judge entered herein on January 24, 1991 is ADOPTED as the court's own with the exception only of the discussion on the state action claim contained on pages 319–320 of the report. I accept the magistrate judge's recommendation with respect to the disposition of the petition for a writ of habeas corpus.

FURTHER, IT IS ORDERED that this petition for a writ of habeas corpus is

DENIED on the ground that petitioner has failed to show that he is in custody in violation of the laws or Constitution of the United States.

## REPORT AND RECOMMENDATION

JAMES GROH, United States Magistrate Judge.

This matter is before the court on a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. (Dkt. # 2)[1]

Petitioner, Andre Jones, is an inmate at the Waupun Correctional Institution, Waupun, Wisconsin, under sentence for sexual abuse of a child. He contends that he is in custody in violation of the United States Constitution, in that he was denied due process, a fair trial and his right to present a defense when evidence of the discovery of a single sperm in a urine specimen from the victim was received against him despite the fact that the specimen had been destroyed without his having had the opportunity to examine it.[2]

Petitioner was convicted by a jury of sexual intercourse with a person under twelve years of age (Wis.Stat. § 940.-225(1)(d)) and cruel maltreatment of a child (Wis.Stat. § 940.201) on February 16, 1988, in the Circuit Court of Juneau County, Wisconsin. (Dkt. # 6, Ex. A)[3] On appeal to the Wisconsin Court of Appeals, he raised several issues, including the one presented here. The Court of Appeals affirmed the conviction in an unpublished opinion, filed March 16, 1989 [441 N.W.2d 755 (table)].[4] He then filed a petition for review with the Wisconsin Supreme Court which was denied without opinion on May 10, 1989 [443 N.W.2d 311 (table)]. (Dkt. # 6, Exs. J, L) On October 16, 1989, the United States

---

1. Leave to proceed *in forma pauperis* was granted on March 30, 1990. (Dkt. # 1)

2. Petitioner initially advanced two grounds for relief, but was found to be in procedural default as to the second due to his failure to present the issue to the Wisconsin Supreme Court for review. So that he might proceed here, he was granted permission to withdraw his second claim. (Dkt. # 13)

3. Documents pertaining to the proceedings in the Wisconsin courts, as well as the petition for

writ of certiorari to the United States Supreme Court, are attached to the Answer to Petition For Writ of Habeas Corpus, Exhibits A–P, pts. 1–3. (Dkt. # 6) (An index of those documents appears at pp. 4–5.) Exhibit P, part 4, contains the trial court transcript. (Dkt. # 7) Transcript references will appear as follows: (Tr. Jones, p. 155)

4. The slip opinion may be found in Exhibit B (Dkt. # 6) and is cited: (Slip Op. p. ___).

Supreme Court denied his petition for a writ of certiorari, 493 U.S. 920, 110 S.Ct. 284, 107 L.Ed.2d 264. (Dkt. # 6, Ex. O) Petitioner has exhausted his state remedies with respect to the claim in issue here.

As I have concluded that petitioner has failed to establish bad faith on the part of the police or the constitutional materiality of the destroyed evidence, both of which are required under *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), I will recommend that the petition be denied. As a further ground of decision I have concluded that the destruction of the evidence was the product of private, not governmental, action.

## FACTUAL BACKGROUND

The facts as summarized by the Wisconsin Court of Appeals are undisputed in most respects and I adopt the following findings derived from that decision:

At approximately 1:10 a.m. on the night in question, the Juneau County Sheriff's Department dispatcher received a call from a man asking that an ambulance be sent to Jones's apartment because "a young girl [was] bleeding between the legs." The ambulance arrived within minutes of the call, and the emergency medical technicians, Robert and Sandra Tyler, found T [5] "bleeding ... profusely" from the vaginal area. There was "a great deal of blood" in T's diaper, which was unfastened, and her lower abdomen appeared to be "very tender." [6]

The Tylers took T to the emergency room of the Mauston hospital, where she was examined by Dr. James Logan, the physician on duty. According to Logan, T was crying and groaning, and, on examination, he found that the area between her vagina and rectum had been torn almost all the way through. He

testified that the "object" inflicting such severe injuries would have to be larger in diameter than a broomstick. Logan repaired T's injuries surgically, and he estimated that she had been assaulted one to two hours before he saw her.[7]

Logan did not note any sperm in T's vaginal area, but stated that because of the profuse bleeding, any sperm could have been either washed away or killed by the blood. He did extract a small urine sample and sent it to the laboratory for analysis. The laboratory technician found one sperm in the sample, and because she felt the sample was rapidly deteriorating and believed that she had no means to preserve it, she discarded it.

Jones's wife, Debra Jones, was babysitting for T, then age two, and another infant in Jones's apartment on the night in question. Debra Jones's two children, Chris (age eleven) and Darryl (age seven), were also present. Chris testified that he and Darryl were awake and watching television in the apartment from about 6:00 p.m. on. He stated that Jones "took T in his room and came back out" around 9:00 p.m. He also stated that Jones went into the room later that night "to change," and that was when he came out and said she was bleeding. Chris said that Debra Jones was asleep on the sofa during this time. He also stated that Jones was wearing "his shorts" that night, but that he changed his clothes and left the apartment after the ambulance came. Chris did not notice any blood on Jones's clothes, arms or hands when he left.

Debra Jones testified that she and Jones had been drinking all day and that she was sleeping on the sofa when Chris awakened her and told her "something [was] wrong with the baby." When Debra entered the bedroom and saw T and all the blood, she said to Jones: "what did you do to her?" and he replied, "noth-

---

**5.** Petitioner refers to the victim as T.L.S., but I will refer to her simply as T, as did the Wisconsin court.

**6.** Robert Tyler was separately employed as the Assistant Chief of Police of Mauston.

**7.** Dr. Logan and nurse Mary Bush also collected various samples from T using a sexual assault kit provided by the police. (Tr. Logan, p. 244)

ing, I didn't touch her." According to Debra Jones, it looked like T's disposable diapers had been "tore off, then tried to retape back on together again, you know, pressed back on." She testified that she had changed T's diaper around 8:00 p.m. that evening. Jones later testified that he changed T's diaper when he "discovered" that she was bleeding.

After T was taken to the hospital, Jones changed his clothes and went out with some friends to get a drink. He eventually "passed out" and the others brought him back to the apartment. When he returned, at about 2:45 a.m., Mauston Police Chief O.J. Foster was in the apartment. Foster had arrived at 1:40 a.m., shortly after Jones had left. While collecting evidence, Foster noted that one of the drawers in a dresser in the room in which T was found was open and two pairs of men's undershorts were "partially pulled out." Debra Jones had testified earlier that Jones owned three pairs of shorts, while Jones, who was not wearing any shorts when he was examined by Dr. Logan at 5:00 a.m., testified that he had only two pairs, having lost the third pair in Chicago some months earlier.

Foster found two bloodstained diapers in the apartment. The stains on one, which he found in the bottom of a trash can, were different from those on the other. The diaper T had been wearing when she was "discovered" by Jones, like the one she was wearing when she arrived at the hospital, was soaked with blood in a single location. The diaper taken from the bottom of the trash was not "soaked," but, according to Foster, "[the blood] was all over the diaper as if it has been used to wipe something ... or someone [off]." When asked by Jones's counsel whether, in his opinion, the diaper could have been used to "wipe off the little girl," Foster said that it could not, because of how severely T was bleeding at the time. Foster's observa-

tion was later confirmed by a state crime laboratory technician, who stated that the surface stains on the diaper from the trash can were "more like a wiping of blood," as opposed to the diaper T was wearing when brought to the emergency room, which contained "a pooling, concentrated stain."

Eventually, Chief Foster took Jones to the police station for questioning. Jones denied assaulting T and when Foster told him he was placing him under arrest for sexual assault, "his eyes wel[l]ed up with tears, he jumped up, slammed his fist down on the desk [and said,] don't send me to prison for this."

Examination of the diapers, bedclothes, vaginal swabs, and other physical evidence at the state crime laboratory revealed several head hairs, two of which were "consistent" with Jones's. The others, however, were not. There were also two pubic hairs on the bedspread which were neither Jones's nor his wife's. The laboratory technician conducting the tests also found no semen on any of the items, although he stated this was not unusual—that none is found in approximately half of all sexual assault cases.

Jones testified that he was at home on the day in question, and that he just "basically walked around the house" from 4:00 to 9:30 p.m., and then went to a bar for several hours, returning around 11:30, whereupon he fell asleep for about an hour. He stated that he then "check[ed] in on" T and noticed that she was pale and shaking—but not crying. He said that when he saw the blood he began hollering, and that he changed her diaper, called the ambulance, and soon thereafter left with his friends. He testified that he never touched T and did not know who did, and he also stated that he never cleaned himself off or disposed of his underwear that night. He testified that he was wearing "gym shorts" when he found T and that he changed clothes before the ambulance arrived.

Other evidence indicated that Jones was examined by Dr. Logan at 5:00 a.m.,

and that no blood was found in his pubic area.[8] Chris was also examined, and it was determined that, because of his age, he was incapable of producing sperm.

*State v. Jones,* No. 88–0855–CR, slip op. at 5–10 [441 N.W.2d 755 (table) ] (Wis.Ct.App. March 10, 1989).

## ADDITIONAL FINDINGS— IDENTIFICATION OF SPERM

Christina Mazur, the hospital technician who performed the urinalysis, was unequivocal in her identification of the sperm, and was unaware of any other organisms (including those associated with yeast infections) which might be confused with sperm. (Tr. Mazur, p. 312) According to Arthur Varriale, Head of the Serology Section for the State Crime Laboratory, "yeast infections produce certain structures in urine which have been reported to be confused with sperm," (Tr. p. 455) but there was no evidence that the victim had any such infection. Her mother testified T had never had a yeast infection (Tr. McNew, p. 526) and Dr. Logan found no indication of a yeast infection in his examination. (Tr. Logan, p. 536)[9]

Additional findings as to particular issues are incorporated in the discussion below.

8. Dr. Logan examined Jones at the specific request of the police and with Jones's consent. [Tr. Logan, p. 273]

9. Chief Foster related a statement he had taken from the victim's mother, on September 7, 1987, that upon learning of T's injuries she had asked Debra Jones if T had a yeast infection. (Tr. Foster, p. 530) McNew, however, testified that she could not recall asking such a question of Jones, nor could she think of a reason to ask such a question. (Tr. McNew, p. 527) Whether or not the exchange occurred, I cannot agree with petitioner's suggestion that McNew's question constitutes evidence that T had a yeast infection. A separate test was apparently performed to address that very question, but petitioner objected to the admission of the results. (Tr. Logan, p. 535) Petitioner presumably had access to the results of that test and could (and presumably would) have offered it if a yeast infection had been found to be present.

## CONCLUSIONS OF LAW

This case presents a narrow and well-defined issue of the proper interpretation to be given to the two decisions of the Supreme Court which have dealt with the consequences of the destruction of evidence by law enforcement personnel. *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).[10] That issue is whether, in the conceded absence of any bad faith or purpose to deprive a defendant of evidence, the failure to preserve potentially exculpatory evidence—here a laboratory slide containing a single sperm—may nevertheless constitute a deprivation of due process. If the answer to that question is in the affirmative, it is then necessary to consider: (1) whether the evidence destroyed was, and was known at the time to be, exculpatory; and (2) whether satisfactory alternative means of asserting that defense were available. *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534; *Youngblood,* 488 U.S. at 56, 109 S.Ct. at 336.[11]

### I. The Bad Faith Requirement

In *Trombetta* and *Youngblood* the Supreme Court approached the government's duty with regard to the preservation of evidence in the context of the not dissimilar prosecutorial obligation, first ex-

10. *Trombetta* concerned the failure of the police to preserve the incriminating breath samples of persons charged with driving while intoxicated. The samples had been tested for the presence of alcohol on a device called the Intoxilyzer, and the results received in evidence. *Trombetta,* 467 U.S. at 488, 104 S.Ct. at 2533. *Youngblood* involved a sexual assault in which the police failed to preserve semen samples on the victim's clothing. As a result, scientific tests, which might have exonerated the defendant, could not be performed. *Youngblood,* 488 U.S. at 57–58, 109 S.Ct. at 337. In each case the Court held there had been no denial of due process.

11. The Wisconsin Court of Appeals resolved all of these issues against defendant in a well-reasoned decision with which I concur. (Slip Op. pp. 316–319) However, I must respectfully disagree with that court's holding that the conduct of the hospital employees with regard to the sperm specimen constituted police action. This issue is discussed *infra* pp. 319–320.

pressed in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), to disclose material evidence favorable to the accused. *Trombetta*, 467 U.S. at 485, 488–489, 104 S.Ct. at 2532, 2533–2534; *Youngblood*, 488 U.S. at 55–57, 109 S.Ct. at 335–337. Under *Brady* the government's duty to disclose is absolute—the good or bad faith of the government in withholding evidence is simply irrelevant. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197; *Youngblood*, 488 U.S. at 57, 109 S.Ct. at 337. However, the Court expressly declined to apply the *Brady* standard in cases involving the destruction of evidence. Instead, a defendant who claims to have suffered as a result of the government's failure to preserve exculpatory evidence must first show bad faith on the part of the police.[12] As explained in *Youngblood*:

> We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. *We therefore hold that unless a criminal defendant can show bad faith*

on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337 (emphasis added).[13]

■ A more unequivocal expression of the bad faith requirement does not come readily to mind. Petitioner argues, however, that no predicate showing of bad faith is required if the government makes use of the evidence, which it destroyed, to secure the conviction.[14] For this he relies upon the following language from *Youngblood*:

> In the present case [Youngblood], the likelihood that the preserved materials would have enabled the defendant to exonerate himself appears to be greater than it was in *Trombetta*, but here, unlike in *Trombetta*, the State did not attempt to make use of the materials in its own case in chief.

*Id.* 488 U.S. at 56, 109 S.Ct. at 336. From this brief passage, petitioner, and the dissenting judge on the Wisconsin Court of Appeals, conclude that proof of bad faith is required only in cases where the state did not rely upon the destroyed evidence in its own case. (Dissent of Sundby, J., Slip Op. pp. 38–41)[15]

---

**12.** The difference in the standards may be explained in part by the fact that the evidence itself still exists in *Brady* cases and its potential effect on the outcome of the case may be assessed with relative ease. Courts, on the other hand, are likely to encounter extreme difficulty in "divining the import" of destroyed evidence. *Youngblood*, 488 U.S. at 57–58, 109 S.Ct. at 337, citing *Trombetta*, 467 U.S. at 486, 104 S.Ct. at 2533. The more significant reason, however, lies in the Court's

> unwillingness to read the "fundamental fairness" requirement of the Due Process Clause (citation omitted), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.

*Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337.

**13.** To establish bad faith, it is necessary to demonstrate " 'official animus' or a 'conscious effort to suppress exculpatory evidence.' " *United States v. Nesbitt*, 852 F.2d 1502, 1520 (7th Cir. 1988) (quoting *United States v. Zambrana*, 841 F.2d 1320, 1341–1342 (7th Cir.1988) and *Trombetta*, 467 U.S. at 488, 104 S.Ct. at 2533), *cert.*

denied, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989).

**14.** The state offered Christina Mazur's testimony that she discovered a sperm in the victim's urine sample.

**15.** Judge Sundby summarized his views of the proper construction of *Youngblood* and *Trombetta* as follows:

> In sum, *Youngblood* and *Trombetta* establish two threshold rules: (1) If the state makes no use of evidence against a criminal defendant, the due process clause is not offended if the police do not preserve potentially exculpatory evidence, unless the defendant can show bad faith on the part of the police. (2) If the state uses against a criminal defendant test results based upon potentially exculpatory evidence which is destroyed, lost or discarded after testing, the due process clause is not offended if the evidence itself is of "extremely low" materiality. (footnote omitted) ...
>
> Neither *Youngblood* nor *Trombetta* answers the question posed in this case: whether the

I find this contention to be without merit for several reasons. The first, and most obvious, point is that the bad faith rule had its origin in *Trombetta*—a case in which the destroyed evidence (the highly-inculpatory test results on the destroyed breath samples) was used by the prosecution to secure the conviction of the defendants. Nevertheless, the very first step of Justice Marshall's analysis addressed the state of mind of the state authorities:

> Given our precedents in this area, we cannot agree with the California Court of Appeal that the State's failure to retain breath samples for respondents constitutes a violation of the Federal Constitution. *To begin with, California authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements* established by *Brady v. Maryland* and its progeny. In failing to preserve breath samples for respondents, *the officers here were acting "in good faith and in accord with their normal practice." Killian v. United States, supra* [368 U.S. 231], at 242 [82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961)]. *The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence.* (emphasis added)

*Trombetta,* 467 U.S. at 488, 104 S.Ct. at 2533. Justice Rehnquist, writing for the majority in *Youngblood,* quoted from this same passage in reiterating the first principle of *Trombetta. Youngblood,* 488 U.S. at 56, 109 S.Ct. at 336.[16] (See also *United States v. Nesbitt,* 852 F.2d 1502, 1520–21 (7th Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989), in which the Court of Appeals specifically interpreted *Trombetta* as having a bad faith component.) His subsequent restatement of the holding (quoted above at p. 314) proceeds logically from the *Trombetta* language and, of course, contains no qualification based upon the use or nonuse of the destroyed evidence.[17]

Secondly, the language upon which petitioner relies has nothing to do with the state of mind of the authorities, but rather with the materiality of the evidence and the available inferences with regard to its exculpatory potential. This is evident when that language is read in context.

The defendants [in *Trombetta*] sought to suppress the test results on the ground that the State had failed to preserve the breath samples used in the test. We rejected this argument for several reasons: first, "the officers here were acting in 'good faith and in accord with their

---

state has a duty to preserve and provide the defendant with material evidence which the prosecution uses in its case-in-chief against the defendant.
*Id.* at 40–42.

**16.** Needless to say, petitioner's argument also runs directly counter to the court's rationale for the bad faith rule and its rejection, in destruction cases, of the *Brady* rule which "makes the good or bad faith of the State irrelevant." *Youngblood,* 488 U.S. at 57, 109 S.Ct. at 337. To accept petitioner's argument would not only reinstate the *Brady* rule in some destruction cases, but would do so not because of the exculpatory value of the evidence, but because of its inculpatory value to the government—a consideration that has not previously been of importance in what has been called "the area of constitutionally-guaranteed access to evidence." *Youngblood,* 488 U.S. at 55, 109 S.Ct. at 336.

**17.** It is worth noting also that neither Justice Stevens (concurring in the judgment only) nor Justice Blackmun (dissenting) read the majority opinion in *Youngblood* as adopting anything

short of a flat bad faith requirement, absent which there is no need for any materiality inquiry. Thus, Justice Stevens wrote, at pages 60–61, 109 S.Ct. at 339:

> I do not, however, join the Court's opinion because it announces a proposition of law that is much broader than necessary to decide this case. It states "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." ... In my opinion, there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.

Similarly, Justice Blackmun stated:

> The inquiry the majority eliminates in setting up its "bad faith" rule is whether the evidence in question here was "constitutionally material," so that its destruction violates due process.

*Id.* at 67, 109 S.Ct. at 342.

normal practice.' " *id.*, at 488, 104 S.Ct. at 2533, quoting *Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961); second, in the light of the procedures actually used the chances that preserved samples would have exculpated the defendants were slim, 467 U.S., at 489, 104 S.Ct. at 2534; and, third, even if the samples might have shown inaccuracy in the tests, the defendants have "alternative means of demonstrating their innocence." *Id.*, at 490, 104 S.Ct., at 2534. In the present case, the likelihood that the preserved materials would have enabled the defendant to exonerate himself appears to be greater than it was in *Trombetta*, but here, unlike in *Trombetta*, the State did not attempt to make any use of the materials in its own case in chief. * * * [18]

*Youngblood*, 488 U.S. at 56, 109 S.Ct. at 336. In short, the Court is making the unremarkable point that the semen samples (shown in the following footnote to have only speculative exculpatory value) might have taken on added importance had they been offered in evidence by the prosecution. It may be conceded that the prosecution's use of destroyed evidence may, in the appropriate case, have some bearing on the materiality issue, or even the question of bad faith.[19] But that does not mean that the bad faith requirement is eliminated.

Finally, I have found no federal decision that adopts the construction of *Trombetta* and *Youngblood* that petitioner here pro-

poses. To the contrary, the only Court of Appeals to consider the issue has come to the opposite conclusion. In *Mitchell v. Goldsmith*, 878 F.2d 319 (9th Cir.1989), a blood grouping analysis was done by the police laboratory on a semen sample obtained from a rape victim. The results of the analysis, which tended to inculpate the accused, were subsequently introduced by the state in its case in chief. *Id.* However, the police failed to preserve the sample for testing by defendant or for further testing which might have had exculpatory value. *Id.* at 321. There was no suggestion of bad faith, but the accused, citing the same language from *Youngblood* upon which petitioner relies here, contended that it was unnecessary to show bad faith because the state had made use of the blood group analysis in its case-in-chief. Applying *Youngblood* and *Trombetta*, the Court rejected the claim and declined even to conduct a materiality analysis. *Id.* at 322. Although not binding here, this decision of another Court of Appeals is entitled to substantial weight and deference. *Richards v. Local 134, Int'l Bhd. of Elec. Workers*, 790 F.2d 633, 636 (7th Cir.1986); see also *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir.1987).

I accept and adopt the conclusion of the Court in *Mitchell*.[20] Indeed, I can see no logical reason for doing otherwise. If the majority in *Youngblood* had actually intended to carve out an exception to the bad faith rule in cases where the destroyed evidence was used to convict, it surely

---

**18.** The asterisked note goes on to discuss at some length the defendant's failure to satisfy the *Trombetta* materiality standards.

**19.** The mere use of the evidence at trial is likely to be of slight weight in the bad faith equation. The key element is "the police's knowledge of the exculpatory value of the evidence *at the time it was lost or destroyed." Youngblood*, 488 U.S. at 56, note 109 S.Ct. at 336, (emphasis added).

**20.** The result in *Mitchell* is consistent with that of the Seventh Circuit in *Nesbitt.* Although the precise question was not discussed in *Nesbitt*, the bad faith requirement was applied even though the government had introduced evidence at trial of the chemicals which had been mistakenly destroyed by government agents. 852 F.2d at 1506, 1520–21. Similarly, in *United States v.*

*Donaldson*, 915 F.2d 612, 614 (10th Cir.1990), the Tenth Circuit held the *Trombetta–Youngblood* bad faith requirement to be applicable in a sentencing proceeding in which the government introduced evidence of the weight of marijuana that had been destroyed before defendants could examine it. For want of evidence of bad faith on the part of the government agents, their due process claim was rejected. *Id.* See also *United States v. Malbrough*, 922 F.2d 458, 463 (8th Cir.1990) (destruction of marijuana plants by police does not constitute violation of due process absent bad faith). To the same effect, see *Kordenbrock v. Scroggy*, 889 F.2d 69, 85–86 (6th Cir.1989) (no violation of due process in the inadvertent destruction of the tape of defendant's confession). The decision was reversed on other grounds following rehearing *en banc.* 919 F.2d 1091 (6th Cir.1990).

would have found a less oblique way of doing so. It would, one hopes, also have explained its rationale for such exception, as none is apparent unless one indulges the improbable assumption that all inculpatory evidence is presumptively of significantly greater exculpatory value than all non-inculpatory evidence.[21]

For all these reasons I reject petitioner's claim that the predicate showing of bad faith on the part of the authorities should be excused here. In light of this conclusion, consideration of the materiality factors is technically unnecessary. However, as a further ground for decision, I also conclude that petitioner has failed to satisfy the second element of the *Young-blood/Trombetta* test—the establishment of the constitutional materiality of the sperm specimen.

II. The Materiality Requirement

■ As previously noted, the Court in *Youngblood* made it clear that the Due Process Clause does not impose any "undifferentiated and absolute" duty to preserve everything that "might be of conceivable evidentiary significance." *Id.* at 58, 109 S.Ct. at 337. Instead, the constitutional duty "must be limited to evidence that might be expected to play a *significant role* in the suspect's defense." (emphasis added) *Trombetta,* 467 U.S. at 488, 104 S.Ct. at 2534.

> To meet this standard of constitutional materiality ... evidence must both possess an exculpatory value *that was apparent before the evidence was destroyed,* and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. (emphasis added)

*Id.* at 489, 104 S.Ct. at 2534; *Nesbitt,* 852 F.2d at 1520.

The gist of petitioner's argument is that the failure of Ms. Mazur to preserve the laboratory specimen deprived him of the opportunity to conduct his own examination of it and to determine for himself the presence or absence of the sperm. To be sure, Ms. Mazur's identification of the sperm did tend to establish that the instrument by which the injury was inflicted upon T was a male sex organ. But *Trombetta* makes it clear that inculpatory value does not automatically invest destroyed evidence with significant *exculpatory* value.[22] That the preserved slide would have shown the organism to be something other than the sperm identified by Ms. Mazur is, at best, mere speculation. Like the breath samples in *Trombetta,* "the chances are extremely low" that the slide would have been exculpatory. *Id.* at 489, 104 S.Ct. at 2534. Indeed, it is more likely than not that, as in *Trombetta,* the preserved slide would have provided inculpatory evidence. Ms. Mazur had 13 years of hospital laboratory experience following two years of technical training. Urinalysis was a common procedure. Part of that procedure was the routine identification and recordation of all matter found in the sediment, including sperm. She was also familiar with sperm from having performed fertility studies. Her identification of the sperm was absolute and unequivocal. There is no evidence whatever that she actually erred. (Tr. Mazur, pp. 305–312)

Petitioner urges that what she saw may actually have been an organism associated with a yeast infection. This argument rests, in the first instance, on the extremely tentative, second-hand testimony of Mr.

---

**21.** It is also unclear how inconsistent results are to be avoided when the issue is first presented by pretrial motion. Presumably the accused would then have the predicate burden of showing bad faith, failing which the due process claim would fail and the "destroyed evidence" could be offered in the government's case. So viewed, an accused could control the application of the bad faith rule by his or her choice of when the due process claim is asserted. It should also be noted that petitioner himself first raised this issue unsuccessfully at the pretrial stage, and it does not appear that any showing

of bad faith was made or even suggested. (Tr. pp. 74–76, 78–81).

**22.** Moreover, the sperm specimen here was of far less importance to the state than the breath samples in *Trombetta,* without which there likely would have been no prosecution. The sperm sample did not itself identify Jones as the assailant, and it did not have the potential either to eliminate him as a suspect or to exclude other instrumentalities or assailants.

Varriale of the Crime Laboratory that "yeast infections produce certain structures in urine which have been reported to be confused with sperm." (Tr. p. 455) Whatever marginal value this testimony might otherwise have had (the enumeration of ways that a misidentification can occur, whether of sperm or people, does not inform as to whether a misidentification actually occurred), it is neutralized and negated by the testimony of Dr. Logan that the victim was examined for yeast infection and that no evidence of it was found. The victim's mother also testified that T had never had a yeast infection. Thus, the likelihood that the slide would have revealed the presence of a yeast mold structure is virtually nonexistent.[23] The mere possibility that the preservation of the sample might have produced a different reading is simply not enough. *Youngblood,* 488 U.S. at 56, note, 109 S.Ct. at 336, note.

I therefore conclude that the sperm specimen was, at best, of speculative exculpatory value and could not reasonably have been "expected to play a significant role" in petitioner's defense. *Trombetta,* 467 U.S. at 482, 104 S.Ct. at 2530. This leaves little to say about the further requirement that the exculpatory value be apparent at the time of the destruction. *Id.* at 489, 104 S.Ct. at 2534. In my view the slight exculpatory value of the specimen would not have been apparent to the most discerning observer. In any event, it is evident from Ms. Mazur's testimony that she didn't consider the sperm to be of importance to anyone—she had made a positive identification of a familiar object and there was no need to show it to anyone else. She had done what she had been instructed to do and the disposal of the slide was in accordance with the routine procedure of the hospital, there being no requirement that specimens be preserved for confirmation by someone else.

To be sure, had she been a crime lab technician the rule and her instinctive response would likely have been different, but for a different reason than petitioner urges. The police scientist would have been sensitive to the potential evidentiary value of the sperm to the government and would have attempted to preserve it to bolster the technician's testimony. But Ms. Mazur is not a forensic technician. Her entire work experience is as a laboratory technician in a hospital performing analyses and tests for diagnostic purposes. Her unfamiliarity with the preservation procedures described by Mr. Varriale is not surprising and betrays no flaw in her ability or the adequacy of the hospital's laboratory facility.[24] Her work requires only laboratory analysis and the recordation of the results. Whatever marginal exculpatory worth the sperm may have had, it was not known to Ms. Mazur at the time. She performed the analysis as directed in the regular way and disposed of the specimen in the regular way. It may be assumed that she was aware that the specimen was from T, who was severely injured, and that the presence of a sperm indicated, at some point, the presence of a male of an age capable of producing sperm. But that does not mean that she foresaw, or should have, that the slide might be of some value to the source of the specimen or to petitioner.

I cannot accept petitioner's suggestion that Ms. Mazur should be held to the standard of law enforcement officers in her appreciation of the importance of the evidence. The test of *Trombetta* is meaningless if the highest level of knowledge is to be attributed to the person who actually commits the act of destruction. If that were the rule no destruction could ever be excused.

Petitioner has also failed to satisfy the remaining part of the test of materiality—

---

**23.** That risk is further reduced by the fact that Ms. Mazur's job includes performing laboratory analysis for yeast infection, and that, according to her testimony, neither those specimens, nor anything else she is aware of, looks like sperm. (Tr. pp. 311–312)

**24.** This discussion assumes, most favorably to petitioner, that it was possible to save the specimen given its rapidly disintegrating condition. (Tr. Mazur, pp. 308–309; Tr. Logan, pp. 263–264)

that the destruction of the slide left him no other means of negating the presence of sperm in T's urine. *Trombetta,* 467 U.S. at 489–490, 104 S.Ct. at 2534. Both Mr. Varriale and Dr. Logan testified that the reliability of an identification depends upon the competency of the technician. (Tr. pp. 258–259, 455) Petitioner had, and utilized, a variety of devices to impeach and undermine Ms. Mazur's identification. He used Mr. Varriale, the state's own expert, to attack Mazur's competence and suggest the potential for misidentification. He testified, contrary to Ms. Mazur, that methods of fixing and storing the specimen did exist which would not only have aided identification but also preserved the specimen for future examination. (Tr. pp. 452–453) He also offered the suggestion that a sperm might be confused with structures associated with yeast infection. The testimony as to the similarity of the organisms was conflicting, and petitioner could easily have reinforced his argument with comparative photographs to underscore the possibility of misidentification.[25] Petitioner was also able to cross examine Ms. Mazur and attempt to raise doubts about her overall ability and experience and the accuracy of her identification.

In short, as in *Trombetta,* petitioner was "perfectly capable" of raising the issue of misidentification without resorting to the specimen itself. *Id.* at 492, 104 S.Ct. at 2535. Indeed, those approaches to impeachment held a significant advantage over the use of the specimen itself in that petitioner was free of the substantial risk that the specimen would have corroborated Ms. Mazur's identification and provided further inculpatory evidence. Finally, it was open to petitioner to argue to the jury

that the preservation of the specimen would have been exculpatory. Given the probability that the evidence would have been inculpatory if preserved, it seems as likely as not that petitioner had more to gain from the destruction of the evidence than from its preservation.

For the foregoing reasons I conclude that the evidence destroyed by Ms. Mazur did not satisfy the test of constitutional materiality as set forth in *Trombetta.*

### III. The State Action Claim

In the foregoing discussion of petitioner's due process claim I have assumed, *arguendo,* that, at the time of the destruction of the sperm specimen, the actions of Dr. Logan and Ms. Mazur were, in the words of the Wisconsin Court of Appeals, "the effective equivalent of action [ ] by the police." (Slip op. p. 16, quoting *State v. Lee,* 122 Wis.2d 266, 276, 362 N.W.2d 149, 153 (1985)).[26] However, the correctness of that conclusion is highly suspect in light of the decision of the Court of Appeals for the Seventh Circuit in *United States v. Koenig,* 856 F.2d 843 (7th Cir.1988).[27] There the court pointed out that to transform private action into government action

> a defendant must prove some exercise of governmental power over the private entity, such that the private entity may be said to have acted on behalf of the government rather than for its own, private purposes.... It is only by the exercise of some form of control that the actions of one may be attributed to another. Restatement (Second) of Agency § 14 (1958). Mere knowledge of another's independent action, does not produce vicarious responsibility absent some manifestation of consent and the ability to control.

---

**25.** If yeast mold structures were actually present, they would have been revealed in the separate analysis Dr. Logan ordered and petitioner could have offered these results into evidence. (Tr. Logan, p. 535)

**26.** The state court factual summary on this issue is found at pages 12–15 of the slip opinion.

**27.** The only authority cited for the state court's holding was the Wisconsin Supreme Court's de-

cision in *Lee,* 122 Wis.2d 266, 362 N.W.2d 149, which, understandably, it felt obliged to follow. As the issue is one of law, *Phelps v. Witchita Eagle–Beacon,* 886 F.2d 1262, 1271 (10th Cir. 1989), it is open to independent review in this proceeding, *Burns v. Clusen,* 798 F.2d 931, 941 (7th Cir.1986); *Dodley v. Duckworth,* 832 F.2d 445, 447 (7th Cir.1987), *cert. denied,* 485 U.S. 967, 108 S.Ct. 1239, 99 L.Ed.2d 438.

*Id.* at 849, 850 (citations omitted).[28] The record here is devoid of any evidence of control by the police of Dr. Logan's actions or those of Ms. Mazur or his other subordinates.[29] By the sheerest coincidence, the EMT who responded to the emergency call was also the town's assistant police chief. But for that fact, there could not even be a pretext of governmental action. While Tyler did tell Dr. Logan that he suspected a sexual assault, it is evident from Dr. Logan's testimony that Tyler neither exercised nor attempted to exercise any control over Dr. Logan's actions.[30] To the contrary Tyler took photographs at Dr. Logan's request.[31]

The thrust of petitioner's argument focuses upon Dr. Logan's zeal to collect "evidence" of the commission of a crime, from which he infers a purpose to aid the prosecution. (Reply Br. p. 8, Dkt. # 16) The same argument was advanced in *Koenig* and was found to have a "fundamental flaw":

> [A]ccording to Koenig, the government should have been required to prove that Federal Express had no intent to assist in the government's enforcement of the criminal laws to avoid having Federal Express deemed its agent. But, of course, it is every citizen's civic duty to do what he can to aid in the control and prevention of criminal activity, and "it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." ... Concern about the effects of crime on the public at large is not a vice which one must assume signifies a conspiracy with the government, but a cherished, commonly held, and wholesome virtue and implies no more than a properly tuned social con-

science. . . . [W]e see no reason to treat anti-crime efforts for the benefit of the citizens of these United States as a whole (instead of just company employees) as deputizing the person or corporation as a governmental agent. It is simply not true that only the government can care about crime.

*Id.* at 850–851 (citation omitted).

To my mind, these words describe precisely the prompt and thoughtful actions of Dr. Logan as he confronted what was quite obvious to all to be an exceptionally brutal attack. Indeed, the words of the Court in *Koenig* would seem to apply with special force to those in the health care professions who are most likely to come into early contact with victims of crimes.

I will therefore also recommend that the court conclude that the action of Ms. Mazur in destroying the sperm specimen was that of a private person and not a government agent.

### RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, pursuant to 28 U.S.C. § 636(b)(1)(B), that petitioner's petition for writ of habeas corpus be DISMISSED.

ENTERED this 24th day of January, 1991.

---

**28.** In *Koenig* a security officer for Federal Express opened a suspicious package which contained cocaine. *Id.* at 845.

**29.** The mere provision of sexual assault kits to hospitals by the police ought not be construed as transforming the hospital employees into government agents. This amounts to nothing more than an invitation to assist the authorities in their law enforcement efforts. Compare the extensive history of cooperation between Feder-

al Express and the Drug Enforcement Administration in *Koenig*, 856 F.2d at 848.

**30.** It does not appear that Ms. Mazur had any contact with Tyler or any other police officer.

**31.** This is in sharp contrast to Dr. Logan's examination of petitioner at the request of the police several hours later. (Tr. Logan, p. 273–74)